## McALPIN, ET AL., V. HENSHAW, ET AL.

1. TREATIES WITH WYANDOTTE INDIANS— *Wyandotte Floats—Rights of Preemptors—Indian Lands—Public Lands—Patents—Trusts.* The east half of section 17, the northeast quarter of section 20, and the northwest quarter of section 21, all in township 13 south, of range 21 east of the sixth principal meridian, in Douglas county, were not open for settlement and preemption until the 9th of July, 1858.

2. The same lands were not subject to the location of what is commonly known as a "Wyandotte float," secured to certain reservees by the treaty made with the Wyandottes in 1842, and amended by the treaty of 1854 with the same tribe, until the 9th of July, 1858.  And an attempted location of such float on the 8th day of May, 1857, was a nullity, and conferred no rights.

3. The patent for said land, issued to the plaintiffs' grantor in 1861, founded upon the illegal location of his float in 1857, does not preclude an inquiry into equitable claims thereto acquired prior to the issuing of such patent.

4. The defendants being in possession and holding separate parcels of said lands by preemption since the 30th of July, 1858, and by purchase and payment therefor from the United States since the 5th of May, 1859, are held to have an equitable title to the land, and the right to the possession thereof; and the holders of the legal title under the patent are regarded as holding the same in trust for the use of the respective defendants according to their respective ownership.

*Error from Douglas District Court.*

EJECTMENT for six hundred and forty acres of land, brought by John McAlpin, Mary Walker, and Isaiah Walker, as plaintiffs, against Iram Henshaw, Christian Knohler, Frederick Whyble, Edward Hale, William Bryman, Daniel Kraus, Barkley Thomas, Mahlon Stubbs, J. Weaver, and Otis Richards, as defendants. The plaintiffs claimed title in fee, under a patent from the government to Irwin P. Long, a Wyandotte Indian, dated May 30th, 1861. Long conveyed the land to plaintiffs by deed. Defendants claimed to be the equitable owners of separate parcels, deriving title thereto from preemption and purchase thereof under the laws of congress.

The case was referred to N. C., for trial. The referee found the facts as follows: That by article 14 of the treaty between the United States and the Wyandotte nation of Indians, dated March 17th, 1842, the United States agreed to grant to Irwin P. Long a section of land of 640 acres, out of any lands west of the Missouri river, set apart for Indian use, not already claimed or occupied by any person or tribe; that by the ninth article of the treaty with the same tribe, made and concluded January 31, 1855, it was agreed by the United States that each of the individuals to whom reservations were secured by the articles first aforesaid, or their heirs or legal representatives, should be permitted to select and locate said reservations on any government land west of the States of Michigan and Iowa, subject to preemption and settlement, said reservations to be patented by the United States in the names of the reservees; that on the 8th of May, 1857, said Long filed in the office of the surveyor-general of Kansas and Nebraska a written notice that he

12

had that day selected and located his reserve of land under said treaties, upon the land described in the plaintiffs' petition; that on the 17th of September, 1857, notice of such location was sent by the surveyor-general to the Department of the Interior; that on the 30th of May, 1861, a patent was executed by the United States, purporting to convey said land to said Long, pursuant to said treaties, which was afterward duly delivered; and that said Long conveyed said lands to the plaintiffs.

The referee also found, that defendant Whyble was in possession of 160 acres of said land under a warranty deed from one Whaley; that said Whaley went into the occupancy of said land in February, 1857, preempted the same July 30th, 1858, purchased the same May 5th, 1859, receiving the usual certificate of such purchase and payment; that a patent had been issued to said Whaley for said land in August, 1860, which was recalled by the commissioner of the general land office, before delivery; that the other defendants were severally in possession of distinct portions of said land, holding the same by and under a right derived from preemption and purchase in all respects similar to the aforesaid preemption and purchase of said Whaley.

The referee also found, that the lands in question are parcel of the lands ceded to the United States by the Shawnee tribe of Indians by treaty ratified November 2d, 1854, and lying between the Missouri State line and a line parallel thereto, and west of the same thirty miles distant; that the land in question was first opened for settlement, preemption and sale, by order of the President on the 9th of July, 1858.

Upon these facts, the referee, as conclusion of law, found that the defendants were the equitable owners of

said lands; that the plaintiffs held the legal title to the said lands in trust for the defendants, according to their several interests; that the defendants were entitled to judgment, that the plaintiffs convey by deed to the defendants severally, according to their said equitable titles, within thirty days after judgment, or in default thereof that the judgment stand for and have the force and effect of such conveyance.

The plaintiffs moved to set aside the conclusions of law, and for judgment in their favor upon the facts found by the referee. The court overruled said motion, and gave judgment in accordance with said report. The plaintiffs excepted, and bring the case here on error.

*Wilson Shannon*, for plaintiffs in error :

1. The reservation of Long of 640 acres was paid for in 1842, at the date of the treaty, and was a debt owing by the government until it was satisfied by the location of the land and approval by the government. The location of his float on the 8th of May, 1857, and the subsequent ratification and approval of said location on the part of the government, is the same, in a legal point, as if Long had on that day entered and paid for this 640 acres; and it is a well settled rule of law, that the entry of a tract of land withdraws the same from market or preemption claim, and no right to the same arising subsequently to the entry and before cancellation can be recognized. Lester's Land Laws, 407-8.

No distinction can be drawn between the location of a Wyandotte float, and an entry at the land office of a tract of land, and the payment therefor. If approved of and patented, the patent relates back to the time of location in the one case, and to the date of the entry in the other.

The defendants going on the land in February, 1857, and before the 9th of July, 1858, when it first became open to preemption and settlement, could not prevent Long from locating his float thereon.

The 5th article of the Shawnee treaty of 10th of May, 1854, is conclusive on this question. It provides that no white persons or citizens shall be permitted to make locations or settlements within said limits until all said lands shall have been surveyed, and the Shawnees shall have made their selections and locations, and the president shall have set apart the surplus. The defendants, by settling on this land before the surplus had been set apart by the president and the other conditions had been complied with, were trespassers. They were intruders into the country set apart for Indian use. A wrong-doer or trespasser can claim no right or advantage from his wrongful act. Nor could the defendants, by their own wrong and illegal act, deprive Long of any right in the location of his float. So far as the defendants are concerned, the land is to be considered as not claimed or occupied by any person at the time of the location of Long's float.

2. The most favorable view for defendants is, that neither Long nor the defendants had any rights to the land in question previous to the 9th of July, 1858, when it was open for the first time to preemption settlement. This is the view taken by the referee, which is plainly and palpably wrong. But concede this to be correct, and then how stand the rights of these parties? When the land was declared open to settlement, the settlement and occupancy of the defendants from thenceforward was legal. The location of Long's float from that date became legal also. The most that could be claimed for.

the defendants is, that they have equal equities with Long. It is well settled, that when the equities of parties are equal, the party having the legal title will prevail. Willard's Equity, pp. 45, 255; *Bruce v. Duchess of Marlborough*, 2 P. Williams, 491; *Robertson v. Cathcart*, 2 Cranch C. Ct., 590. The patent issued to Long made his title perfect, both in law and equity.

*Thacher & Banks*, for defendants in error:

1. The rights of each, the plaintiffs and defendants, to the land in controversy, depend upon the law governing the title and transfer, and the acts of each party thereunder. 2 Iowa, 1; 9 How., U. S., 328; 13 Pet., 517.

The defendants and the plaintiffs had separate and dissimilar contracts with the government. The contracts of defendants were those of preemptors—contracts formed by the preemption law, and their acts under it. The contracts of plaintiffs' grantor were formed by the Wyandotte treaties, and his acts under them.

The actual settler is the most favored of the entire class of purchasers. *Clements v. Warner*, 24 How., 397; 1 Scam., 344. The title under a preemption right *held* better than titles under floating rights, under act of July 14th, 1832, and act of June 19th, 1834. 14 How., 377; 7 Wallace, 224; 6 Wallace, 402.

Land scrip, or certificates issued by the government, giving the holder a right to a certain *quantity* of land, gives no right to any particular tract, until located according to law. 3 Texas, 67.

2. The lands in question were not, at the time of the laying of the float thereon, a part of the public lands; neither open to preemption and settlement, nor subject to being taken by any other person, tribe, or power, save

the Shawnee Indians. They had an equitable interest in it. 1 Black, 352. It was *set apart for*, occupied and claimed by them, up to the time of the proclamation opening the lands to preemption. See treaty of May 10th, 1854, articles 1, 2; 10 Stat. at Large, 1056.

3. The plaintiffs' grantor, Long, and the defendants stood on *precisely the same grounds*. Their rights to take action in acquiring the land in question commenced from the same day, (the 9th of July, 1858,) the day on which the lands in question were proclaimed by the president as open to preemption and settlement.

The only action taken by plaintiffs' grantor was on the 8th of May, 1857. The defendants made settlement February, 1857, and within thirty days thereafter attempted to file, and were in visible and notorious occupancy and possession of the premises, improving, and had made large and valuable improvements on the same, when Long took his first step. This was enough to put him on inquiry. *Hughes v. U. S.*, 4 Wall., 232.

4. But after the opening of the lands to preemption and settlement, defendants were permitted by the officers of the government to file on the lands in question, which they did July 30th, 1858; and on the 5th of May, 1859, the defendants purchased and paid for the lands and took their evidence of title, which preemption and purchase was approved by the commissioner of the general land office in August, 1860.

Long took his patent with notice of the defendants' rights to the land, and subject to it. *Story v. Lehmer*, 10 Ohio St., 93; 1 Bland, 299; 1 Scam., 344.

The issuance of the patent was but a ministerial act; 1 McLean, 535; 2 Iowa, 11; and the legal title granted thereby must be transferred to defendants.

The opinion of the court was delivered by

KINGMAN, C. J.: This cause comes to this court from a judgment rendered upon the report of a referee. No exceptions were taken to the report as to the facts found, but were taken to the conclusions of law arising from those facts. The court therefore need not look beyond the facts found by the referee; and the only question is, whether the law was correctly applied to the facts. The suit was for the recovery of six hundred and forty acres of land in Douglas county. The plaintiff claims the land through and under a Wyandotte float, and the defendants claim under a preemption made by several different parties on different portions of the section. Some points are conceded by all parties. Among them, that the land was not open to preemption and settlement previous to the proclamation of the President on the 9th of July, 1858, and that if Irwin P. Long's title was good, the plaintiffs ought to recover, as whatever title was at any time in Long is now in the plaintiffs.

The decision of the case must turn upon the point of whether the land in controversy was open for the location of Long's float prior to its being opened for preemption and settlement by the proclamation of the President on the 9th of July, 1858; for that was the first day on which the defendants could get any claim by reason of their settlement or attempted preemption. Previous to that day their settlement was a trespass, and cannot be recognized in law, whatever may have been the natural justice of their claims. If previous to that time it was open for the location of the Wyandotte float of Long, then his location thereof on the 8th of May, 1857, gave a right in law, of which the preemption of the defendants, and

those under whom they claim, could not divest him. If it was not so open, then the settlement of the defendants, and their preemption, vested rights in them which could not be taken away by law, or by the determination and action of the departments of the government, and give them the better equities, and the decision of the referee must stand.

As both the referee, and the counsel for defendants in error seem to lay some stress upon the fact that the defendants entered upon and settled their lands in February, 1857, and make valuable improvements thereon, and were in possession thereof when Long's float was located, it may not be improper to state why we have decided as above indicated, that they acquired no rights thereby. These lands had at one time belonged to the Shawnee Indians, and by the fifth article of the treaty made with that tribe on the 10th of May, 1854, ( 10 U. S. Stat. at Large, 1056,) it is provided that, "No white person or citizen shall be permitted to make locations or settlements within the thirty-mile limits, until after all of the lands shall have been surveyed, and the Shawnees shall have made their selections and locations, and the President shall have set apart the surplus." Now, until these acts were done, no person having the right of preemption could make the settlement necessary to initiate that right on these lands. The things to be done were, the survey, the selection and location by the Indians, and the act of the President setting apart the surplus. This last act would be the evidence that the others had been performed; and until this was proclaimed, all settlements were in law mere trespasses, and cannot be regarded by the courts. On the other hand, we may remark here, that if the lands were not open for the location of Long's

float at the time he laid it in 1857, such location could give him no rights in law, and he acquired none subsequently until after the defendants had perfected theirs by preempting.  The action of the departments of the government in recognizing Long's location of the float by issuing a patent for the land, in 1861, could give him no rights as against the defendants, unless his original location was authorized by law when it was made.

The right of the plaintiffs' grantor to any land rests upon two treaties between the Wyandotte tribe of Indians and the United States.  By article 14 of the treaty of March 17th, 1842, the United States agree to grant by patent in fee simple 640 acres of land to Irwin P. Long, out of any lands west of the Mississippi river set apart for Indian use not already claimed or occupied by any person or tribe; ( 7 U. S. Stat. at Large, 608-9.)  By the treaty of March 1st, 1865, it is provided in section nine, among other things, that each of the reservees under the treaty of 1842, of whom Long was one, should be permitted to select and locate their lands on any government lands west of the States of Missouri and Iowa subject to preemption and settlement. ( 10 U. S. Stat. at Large, 1162-3.)  The same section provides that any selection of, settlement upon, or claims to, land included in any of said reservations, made by any other person or persons, after the same shall have been selected by the reservees, their heirs or legal representatives, shall be null and void.

We do not understand that these clauses of separate treaties conflict.  The one granted 640 acres of land to Long, to be selected out of any lands west of the Mississippi river set apart for Indian use not already claimed or occupied by any person or tribe; the other enlarges this right, by giving the privilege of selecting the land

on any government lands subject to preemption and settlement, west of the States of Missouri and Iowa—so that the reservees could locate their claims on either of said classes of lands. By the last treaty the reservees are not restricted in the location of their floats to land set apart for Indian use, as in the first, but may locate them upon certain government lands; and this requires an examination of the right of Long to locate under each of the treaties. His right under the treaty of 1842 depends upon whether the land in controversy was set apart for Indian use, and not already claimed or occupied by any person or tribe; for such are the conditions of the grant. Up to the treaty with the Shawnee tribe on the 2d of November, 1854, this land all belonged to the Shawnee Indians by virtue of the treaty made with that tribe in 1825, and the action of the President in May, 1844. They held it by deed: ( 10 U. S. Stat. at Large, 1053.) Up to this time, Nov. 2d, 1854, it is too apparent to need discussion, that there could be no location of the float of Long on the land in controversy, for while it was Indian land, it was Indian land *already claimed and occupied* by a tribe. The Shawnees claimed it; and after the habits of the tribe, occupied it. It would have been bad faith to have given any member of any other tribe any part of this land, without the consent of the Shawnees. If the executive and senate could deprive the tribe, without their consent, of one acre, by a treaty with another tribe, they could as well have deprived them of all of it. But this they did not do. They scrupulously avoided doing it by inserting the limitation that the lands should not be occupied or claimed by a person or tribe.

Did the grantor of the plaintiffs obtain any right to locate his float on this land by reason of the treaty with

the Shawnees, made November 2d, 1854? By the first section of this treaty the Shawnees ceded all this tract to the government, amounting as it was supposed, to 1,600,000 acres. By the second section the United States ceded back to the Indians 200,000 acres of this land, to be afterwards selected. The most of the selections were to be made on a part of the tract lying between the Missouri State line, and a line parallel thereto, and west of the same, thirty miles distant, and covering the land in controversy. By this treaty, as we understand it, 200,000 acres of the land remained Indian lands; the residue thereof was government lands. It can make no difference that it could not be known what part was government lands and what part Indian lands until after the selections were made.

In this, as in many other cases, it may be difficult to define in legal terms, with accuracy and precision, the exact estate which the Indians had in this thirty-mile tract, after the treaty, and before the selections were made and the President's proclamation issued. The whole tract was ceded to the United States; 200,000 acres thereof, in a certain locality containing about 480,000 acres, were ceded back to the Indians, and were certainly theirs by the terms of the treaty. They had some interest in every acre of the tract, an interest certain in amount, contingent as to location. Any day, until the selections were all made, the land involved in this controversy was liable to be selected by some one of the Shawnee Indians. Such a right on their part was undoubted, and is not questioned even by the learned counsel for the plaintiffs in error. Therefore, the Indians had a contingent possessory right to every foot of this strip, subject to be converted into an absolute legal right

any day.   Such a right, while that condition of things remained, was inconsistent with the right of any other person to obtain any interest in the land, present or prospective, absolute or contingent.   It is obvious from the terms of the treaty that great care was taken in order that perfect freedom to select the lands should be preserved to the Indians.   The latter clause of section five, quoted above, excluded in terms any white person or citizen from making locations or settlements on this land.   This was intended to guard the right of the Indians to a free and unrestricted selection.   It conferred no right, or made no prohibition, which the law would not raise on the treaty otherwise.   Without this clause there would have been in law no right on the part of any one to make settlement upon or acquire rights in the land.   The object of the clause was to secure by plain and positive stipulation to the Indian· his right of selection, free from interference by the parties that experience had shown were most likely to interfere with and embarrass such free action.   No inference can rightfully be drawn from it in favor of the plaintiffs' grantor.   If he had a right to locate his float on this land without this clause, it remained to him; but the clause does not give it, even by inference.   Whatever right he had was a right secured by treaty, and was absolute, and would become certain, definite, and fixed, whenever he exercised his right to locate his float on any lands subject thereto by the terms of the grant.   Wherever he had a right to locate his float that right was perfect, not contingent; and once exercised could not be disturbed or invaded by any one.   This affords a fair test of his right to locate on this land.   When he did it on the 8th of May, 1857, his location was liable to be overthrown and

made nugatory on the very next day, or at any time thereafter, at the option of any Shawnee, until all the selections were made. Now this right of the Shawnees to select this land at any day after the float was laid upon it was incompatible with the right of plaintiffs' grantor. By the very terms of the grant, " any selection of, settlement upon, or claim to land included in any of said reservations, made by any other person or persons, after the same shall have been selected by the reservees, their heirs and legal representatives, shall be null and void." Such is the language of the grant. Now, if his claim to this land was subject to a *right* on the part of the Shawnees to select the same land, then it shows at once that it was not such land as was open to his claim. It can make no difference that the Indians did not afterwards select this land. We are determining what *his* rights were, at the time. They were subject to no such contingency as that just indicated. They were absolute and exclusive, not possible and contingent. This conclusion is strengthened by other considerations. If he had a right to so locate, he was entitled to a patent; and it might have issued in a week, however unlikely such an event was to occur, and the patent would have been an obstruction to the right of selection guarantied to the Shawnees. Again, if he had a right to so locate, subject to the possibility of having his location set aside by the Shawnee Indians selecting the same lands, he had a right to settle on the same lands so located, for he acquired his rights from the grant, not from the patent, which might issue; and an actual settlement on the land, coupled with a contingent right, would have embarrassed that free selection reserved by the treaty. No man likes to have his rights to land clogged by an adverse posses-

sion.   It renders his rights in the land, however clear his
title may be, less valuable.   Much more would this be
the case with an Indian than with a white man, unin-
formed as he is as to the various and complex laws that
civilized society has found necessary to protect its inter-
ests and secure the rights of its members.   A fair con-
struction of the treaty with the Shawnees, and a consid-
eration of the objects contemplated therein, lead to the
conviction that at the time Long made his location he
had in law no right so to do.

We have not decided whether the lands were Indian
lands or government lands.   If they were Indian lands,
they belonged to the Shawnees, and were not subject to
the location of Long's float, under the provisions of the
treaty of 1842.   If they were government lands, they
were not open for preemption and settlement, and of
course not subject to the location by virtue of the enlarged
provisions of the treaty of 1855, until they were made so
by the proclamation of the President.   This proclama-
tion was made on the 9th of July, 1858; and then, for
the first time, could the grantor of the plaintiffs lawfully
take any steps to locate his float thereon, and his loca-
tion previous to that time, being without authority of
law, and not within the limits of the grant, was a nullity,
and neither gave any rights nor conferred any advantages.

The conclusion of the referee, "that up to the 9th of
July, 1858, neither the plaintiff nor the defendants, nor
said Long, had acquired any right, legal or equitable, in
or to said land," is correct.   The land on this last-men-
tioned day was open for the location of Long's float, or
to any qualified person to preempt the same; and who-
ever took the first steps would have the better right.
Long took no action to give him any rights to the land.

The defendants, and those under whom they claim, on the 30th of July, filed each his notice of settlement and intention to preempt, and from that time at least had a clear legal right in the land. This right was a lawful possession, and the privilege of purchasing the land at the minimum price at any time before actual sale. This purchase was finally made on the 5th of May, 1859. By this purchase a good equitable title was obtained, at a time when Long had no right or interest in the land. The subsequent issue of a patent to Long gave him the legal title to the land. It is claimed for the plaintiffs in error that the issue of a patent relates back to the entry, and takes date with it. This is undoubtedly law. *Ross v. Barland*, 1 Peters, 655; *French's Lessee v. Spencer*, 21 Howard, 240. But it relates back only to show that the patentee was the owner at the date of entry; not to create *equities*. Had Long's entry been one authorized by law, then the patent would relate back, and his title run from that date, but as it was not, his rights began with his patent. It had no lawful entry to relate back to. The patent was issued when the equities of the defendants were in full force, and perfect; and of such equities, the records in the land office, and the open possession of defendant, were sufficient notice. With these conclusions the judgment of the court coincides. The plaintiffs held their legal title, subject to the superior equitable title of the defendants. *Lindsey v. Hawes*, 2 Black, 554; *Story v. Lehmer*, 10 Ohio St., 93.

The judgment is affirmed.

SAFFORD, J., concurring.

VALENTINE, J , having decided the cause in the court below, did not sit in this case.