## BRANSON *v.* WIRTH.

The government, as appeared by the *exemplification* of the record of a patent, had granted, January 10th, 1818, to A. the northeast quarter of a certain tract of land, in pursuance confessedly of a warrant and location upon *that* quarter; the exemplification of the record of the patent, however, showing that eight years after the date of the patent a "memorandum" had been made [by whom did not appear] on this record, that the patent itself was issued for the *south*east quarter. The government had confessedly issued a patent to Z. for this *south*east quarter on the 7th of January, 1818; that is to say, three days before the date of the patent to A., for whatever corner the patent to A. really was. In 1819 A. conveyed to B. the *south*east corner, describing it as the quarter which had been granted by patent to him, January 10th, 1818. In 1824 B. conveyed to C., describing the land as the *south*east corner. In 1825 C. conveyed to D.; and in 1829 D. conveyed to E., the deeds of both these last describing the land as the *south*east corner; but the latter deed not being put on record. In 1827 a private act of Congress was passed authorizing the legal representative or assignee of A. to register with the register of the proper land office any unappropriated quarter-section, &c., "in lieu of the quarter-section patented to the said A. on the 10th of January, 1818, which had been previously patented to Z.;" and in pursuance of this act E. did, in 1838, enter another lot.

In 1843, on an assumption that the government had conveyed away its title to it, the *north*east quarter was sold under the laws of Illinois for State taxes and bought by O. And in 1868, on an assumption that the title was still in the government, the same quarter was patented by the United States to P.

On a suit by P. against O., *Held*—

1st. On a supposition that the patent was given for the *north*east quarter, that there was no estoppel shown either by the deeds from A. to E., both inclusive, or by the act of Congress (it being a private act), or by E.'s selection of a new lot which prevented the defendants from showing the truth of the case, to wit, that the patent was for the *north*east quarter.

2d. That the "memorandum" on the record being no part of the record, and but the memorandum of a third person, could not be received in evidence to contradict the record.

3d. That accordingly it was error to have instructed the jury that the defendants had not shown outstanding title in the northeast quarter (the lot sued for), either in A. or in any one under him, and that the plaintiff was entitled to recover.

IN error to the Circuit Court for the Southern District of Illinois; the case being thus:

Wirth brought ejectment against Branson and another for the recovery of the *north*east quarter of section 18, in a certain township in Fulton County, Illinois. On the trial he made title under a patent from the United States to one Leonard for the lot in question, dated 20th February, 1868.

The defendants claimed title under a sale of. the lot for taxes in 1843 under the laws of Illinois, in consequence of the non-payment of the taxes laid in 1839. But as public lands cannot be taxed, it was necessary for the defendants to show that the government title was extinguished prior to 1839. To do this they gave in evidence, from the records of the General Land Office, an exemplified copy of a military land warrant for 160 acres of land issued to Giles Egerton, in December, 1817, a location thereof in his favor upon the lot in question on the 10th of January, 1818, and a patent to Egerton for the same lot dated on the same day. But on the margin of the exemplified copy of the patent was a memorandum, copied as follows, viz.:*

"INDORSED.

"This patent was issued for the *S*. E. quarter instead of the *N*. E. quarter, as recorded; sent certificate of that fact to *E*. *B*. *Clemson*, at Lebanon, Illinois. See his letter of 19th May, 1826."

The defendants did not offer this memorandum in evidence, and objected to its being read, but, at the instance of the plaintiff, it was allowed to be read to the jury.

---

* The word "*indorsed*," in said memorandum, was in red ink. The rest of the memorandum in black ink.

The defendants then gave in evidence a deed dated July 29th, 1819, from Giles Egerton to one Thomas Hart for "the *south*east quarter of section 18," &c., closing the description as follows:

"Which quarter-section was granted to the said Giles in consideration of his military services, as will appear by a patent obtained from the General Government, dated the 10th day of January, 1818."

[The defendants contended that the word "*south*east" in this deed was written by mistake, and should have been "*north*east."] They further adduced (and in support of this view) an exemplified copy of a patent from the United States to one James Durney (another soldier), dated January 7th, 1818 (that is to say, three days before the alleged grant to Egerton), for this *south*east quarter of section 18.

The plaintiff in rebuttal gave in evidence deeds for the *south*east quarter-section as follows: from Thomas Hart to Samuel Hunt, dated 12th May, 1824; from Hunt to *E. B. Clemson*, dated 7th April, 1825; and from Clemson to John Shaw, dated 20th October, 1829; the two former being regularly recorded; the last not recorded. The plaintiff then gave in evidence an act of Congress, approved March 3d, 1827, entitled "An act for the relief of the legal representatives of Giles Egerton," by which it was enacted that the legal representative or assignee of Giles Egerton be "authorized to enter with the register of the proper land office, any unappropriated quarter-section of land in the tract reserved, &c., *in lieu of the quarter patented to the said Giles on the 10th day of January, 1818, which had been previously patented to James Durney*, and upon such entry a patent shall issue to such representative or assignee for the quarter-section so selected." The plaintiff then proved that John Shaw entered another lot in April, 1838, in pursuance of this act. To all this evidence offered by the plaintiff in rebuttal the defendants objected.

It thus appeared from the records of the land office (barring the memorandum in the margin of the patent), that the

*north*east quarter of section 18, which was the lot in question, had been regularly entered under a valid land warrant, and regularly patented; but it also appeared that the patentee, either by mistake of the scrivener or from some other cause, had conveyed to a third person the *south*east quarter of the same section, as the lot so patented; and that the subsequent conveyances copied this description. Also that one of the subsequent grantees, several years afterwards, finding the *south*east quarter embraced in a prior patent, got leave from Congress to enter another lot in the place of it, and did so.

This was all the evidence in the cause. The patent itself was not produced; nor did it appear what had become of it.

The court instructed the jury, that the defendants had not shown outstanding title to the lot in question, either in Giles Egerton or in any one claiming under him, and that the plaintiff was entitled to recover. To this charge the defendants excepted.

*Mr. Horatio C. Burchard, in support of the ruling below:*

I. *Egerton's patent granted the southeast quarter.*

Four independent facts seem to show that although Giles Egerton was entitled to receive upon his location a patent for the *north*east quarter, the patent he actually received was for the *south*east quarter.

1st. The marginal entry on the record.

2d. The recitals in Egerton's deed to Hart.

3d. The conduct of the subsequent grantees.

4th. The recitals in the act of Congress of March 3d, 1827.

1. *The marginal entry.* This was undoubtedly written upon the face of the record. It has stood there since 1826; nearly fifty years. It cannot be presumed to have been made without the authority or sanction of the officer having charge of the records; the Commissioner of the General Land Office. It was there on record, and upon the page of the record of the alleged patent, when the commissioner, in 1868, made the exemplified copy of the record offered in evidence below. He had no right to separate them. They were the record as he found it.

2. *The recitals in Egerton's deed.* Egerton declares in his deed to Hart that it will appear by his patent, obtained January 10th, 1818, that the *south*east quarter of section 18, &c., was granted to him in consideration of his military services. He doubtless then had in his possession the patent actually issued to him on the 10th of January, A.D. 1818, and from it himself drew, or the scrivener for him, the deed to Hart. The deed itself supports this conclusion; it contains internal evidence of the fact. The description of the tract, the recitals of Egerton's title and consideration for which he obtained a patent, and date of its issue, must have been taken from the patent. The particular quarter-section upon which a bounty land warrant should be located in a military tract was then determined by lot, and not by selection, as at present.* The soldier held no certificate of location. His patent was the only evidence furnished him as to what tract he had become the owner of.

3. *The conduct of Egerton's grantees.* It is evident that there was a mistake in the patent to Egerton, as intended to be issued, or in the deed from him to Hart, and in the mesne conveyances from Hart to Shaw. If the successive deeds followed the patent, each purchaser inspecting the title-papers of his grantor would have no occasion to question the validity of the title he was about to acquire. When, however, it appeared that an elder patent had been issued to Durney for the *southeast* quarter, it behooved the last grantee, tracing title to that tract through Egerton, to examine his title-papers and ascertain and have rectified any mistake occurring therein. To do this required a comparison of deed with prior deed and with the patent. If a misdescription had occurred in any mesne conveyance, or in the deed from Egerton to Hart, the mistake would have been sought to be corrected by a new deed from Egerton, or a bill in chancery had he refused to execute one. The conduct of the parties—the grantees of Egerton—shows that no mistake was discovered in the deeds, and no variance in them from

---

* Act of April 29th, 1816, Land Laws, vol. 1, p. 702.

the patent.   No new deed appears to have been executed or
proceedings instituted to correct a mistake in the deeds and
make them correspond with the patent.   On the contrary,
the grantee came to the United States claiming that his deed
and the patent to Egerton were conveyances of the *south*east
quarter of section 18, and that as the tract had been granted
by an elder patent to Durney, the government should give
the legal representative or assignee of Giles Egerton the
right to select another quarter-section in lieu thereof.   The
fact that Durney's patent for the southeast quarter was older
than Giles Egerton's must have been ascertained *by an ex-
amination of the latter patent itself.*

4. *The act of March 3d,* 1827.   The act, as a reason and
justification for its passage, alleges that the quarter patented
to Giles Egerton on the 10th day of January, A.D. 1818,
had been previously patented to Durney.   The court will
not presume that the legislative department declared this to
be a fact and gave it the sanction of a legal enactment with-
out satisfactory proof of its truth.   The patent itself, at that
time in the possession of Egerton or his grantee, was, doubt-
less, produced before the committee which examined and
recommended the passage of the bill.

The four facts to which we have adverted corroborate
each other, and taken together are only reconcilable with
the conclusion that no matter what patent should have been
and was intended to be issued to Giles Egerton, the patent
signed, sealed, and received by him, purported to grant the
*south*east quarter and not the *north*east quarter.

The proof, therefore, shows that—

II.  *The legal title to the northeast quarter remained in the United
States until the issue of the patent to Leonard.*

The location of Egerton's bounty warrant upon the land
did not convey to him the legal title.   It gave him a right
to a conveyance, which right he could waive or relinquish.
The title of the United States can only pass by patent or by
act of Congress in words of present grant.*

---

*   Wilcox *v.* Jackson, 13 Peters, 499.

III. *The plaintiffs in error are estopped from setting up title in Egerton.*

They present the issue of a patent to Egerton for the *north*east quarter, either as a basis of title in themselves or as an outstanding title in him or in Hart. They can assert for or under him no better title than he could for himself or his grantees.

A person claiming title under one who is estopped, is also bound by the estoppel.*

1st. Egerton, by the deed to Hart of the *south*east quarter, and its recitals that his patent granted that tract, and by the successive conveyances from Hart to Shaw, with the acceptance by the latter of another quarter-section from the United States in lieu of that quarter, became estopped from claiming that his patent granted him the *north*east quarter.

A person is always estopped by his own deed, and will not be allowed to aver anything in contradiction of what he has once solemnly and deliberately admitted.† Admissions which have been acted upon by others are conclusive against the party making them, in all cases between him and the party whose conduct he has thus influenced.‡

2d. Egerton's successive grantees, Hart, Hunt, Clemson, and Shaw, are bound and, estopped by the recital and facts that estop Egerton.

A party who executes a deed is estopped from denying not only the deed but every fact which it recites, and all persons claiming under and through the party estopped are bound by the estoppel.§

3d. The recitals in the act of Congress of the 3d of March, 1827, and Shaw's entry of a quarter-section under its provisions, also estop him from questioning the truth of the

---

* McCravey *v.* Remson, 19 Alabama, 430; Phelps *v.* Blount, 2 Devereux, 177.

† Lazon *v.* Peeman, 3 Mississippi, 529; Denn *v.* Brewer, Coxe, 172; Ridgway *v.* Morrison, 28 Indiana, 201.

‡ McClellan *v.* Kennedy, 8 Maryland, 230; Cummings *v.* Webster, 43 Maine, 192.

§ Stow *v.* Wyse, 7 Connecticut, 214.

facts recited in the act.* The act asserts that the quarter patented to Egerton on the 10th day of January, A.D. 1818, had been previously patented to Durney. The latter's patent was for the *south*east quarter. Egerton's patent, therefore, according to the act, granted that quarter. Shaw, Egerton's remote grantee, availed himself of its provisions; he must be held to admit its statements. The entry was to be in "lieu of" the quarter patented to Egerton, so that *it was a relinquishment by Shaw of whatever quarter that patent granted.* The act and the entry would estop Shaw, and all parties whose right or title under the patent Shaw had acquired, from claiming title under the Egerton patent.

4th. The estoppel is available at law. Equitable matters creating an estoppel have been recognized in many cases as available at law.†

*Mr. S. C. Judd, contra.*

Mr. Justice BRADLEY delivered the opinion of the court.

The court below instructed the jury, that the defendants had not shown outstanding title to the lot in question, either in Giles Egerton, or in any one claiming under him, and that the plaintiff was entitled to recover. To this charge the defendants excepted.

The court did not state the ground on which the charge to the jury was based; whether on the ground that the original patent of Giles Egerton was in fact given for the southeast quarter-section, and not for the northeast quarter; or on the ground that Egerton and those in privity with him were estopped on that point.

We will first consider the ground of *estoppel*, on the supposition that the patent was, or may have been, in fact given for the lot in question, but that the supposed estoppel prevented Egerton, and those in privity with him, from alleg-

---

* Cary v. Whitney, 48 Maine, 516.

† French v. Spencer, 21 Howard, 228; Brown v. Wheeler, 17 Connecticut, 345; Corbett v. Norcross, 35 New Hampshire, 99.

ing that fact. What, then, was this estoppel? Who was bound by it? and who can set it up?

The supposed estoppel is founded on the deed given by Egerton to Hart, in July, 1819, for a lot described as the *southeast* quarter of section 18, and as granted to Egerton by his patent of January 10th, 1818.

Now if the patent thus referred to was, in fact, for the northeast quarter, there was a mere mistake in the deed which might have been rectified in equity, or, perhaps, by a reference to the patent itself. But standing as it did, without being reformed, what at most was the estoppel which it created? and who could have taken advantage of it at that time? First, Egerton was technically estopped, at law, to deny that his patent covered the southeast quarter, which the deed, in terms, conveyed; secondly, this estoppel related only to the southeast quarter; thirdly, it existed only as between Egerton on the one side, and Hart on the other, and their respective privies. Thus far, it did not bind the government, nor could the government take advantage of it, being a stranger to the estoppel. It did not impair the title of the government, or of its patentee, to the southeast quarter, assumed to be conveyed; nor did it reinvest the government with the title to the northeast quarter. If the original patent was in fact for the northeast quarter, the government could not have reclaimed that quarter against its own patent, whatever deed Egerton may have given to a third party for a different lot. And Egerton's heirs, or his grantees of the northeast quarter, would have stood in his place. And the defendants in this case, coming into possession of that quarter under a tax sale, are to be regarded in the same light (at least that is the plaintiff's claim) as Egerton himself would be if he were in possession of it.

Such was the position of the parties at the giving of the deed to Hart in 1819. Has anything since occurred to change that position, and to divest the title of the lot in question out of Egerton, or his legal assigns, by estoppel? We think not.

The assumed title to the southeast quarter conveyed to

Hart passed from hand to hand by several mesne convey-
ances until, in 1827, the then grantee procured the act of
Congress, authorizing him to enter another lot in lieu of
the southeast quarter, which the act supposes to have been
patented to Egerton, but previously patented to James Dur-
ney. It is contended that this act and the subsequent entry
of another lot in pursuance of it, operated to estop Egerton
and his grantees from claiming the northeast quarter.

But the legal estoppel which affected Egerton and his
grantees, was not changed by that act. And in speaking of
the grantees of Egerton, we must distinguish between those
claiming under the deed to Hart, which assumed to convey
the *southeast* quarter, and those claiming (as the defendants
do) as grantees of the *northeast* quarter. The former class
are those who are entitled to claim the benefit of the estop-
pel; the latter we are supposing to be bound by the estoppel.
The act of Congress was procured in 1827 by the grantee
under the deed to Hart, eight years after the date of that
deed; and it recites that the patent was for the southeast
quarter. Now it is well settled that recitals in a private act
bind none but those who apply for it.* The act in question
was made for the benefit of the grantee under Hart's deed.
He claimed the southeast quarter, but found that it had been
patented to Durney; and he applied for leave to enter an-
other lot. How can his act change or enlarge the estoppel
by which Egerton and his grantees of the lot in question
were bound before? A person entitled to the benefit of an
estoppel may transfer it by transferring the estate, but he
cannot change it or enlarge it. Every grantee of the south-
east quarter, through Hart, to the end of time, may estop
Egerton and his assigns from denying that his patent was
for the southeast quarter. But the government is not a
grantee of that quarter under or through Hart. The gov-
ernment is still, in law, a stranger to the estoppel.

It is supposed that Egerton and his assigns are estopped
by the fact that the government was induced to give to Eger-

---

* Elmondorff *v.* Carmichael, 3 Littell, 472, 480· 2 Cowen & Hill's Notes,
251.

ton's grantee another lot in consequence of the declaration contained in his deed to Hart. This may be ground for an equitable estoppel, not a legal one, and therefore not available in an action of ejectment where the title is in issue. If one person is induced to do an act prejudicial to himself in consequence of the acts or declarations of another, on which he had a right to rely, equity will enjoin the latter from asserting his legal rights against the tenor of such acts or declarations. But, then, the person charged has an opportunity of explaining, and equity will decree according to the justice of the entire case.* Had the government, after granting another lot to Egerton's grantee, in pursuance of the act of Congress, filed a bill against Egerton to prevent him from asserting title to the lot in question, perhaps it would have been a good defence for him to have shown that the discrepancy in his deed was a mere mistake, and that the agents of the government had no right to rely on it, because their own records would have shown that the patent was in fact given for the northeast quarter. But however this may be, the only estoppel arising out of the transaction referred to, which the government could set up, was an equitable and not a legal one.

Even if it were otherwise, and if the government *could*, in any aspect of the case, claim the benefit of the legal estoppel, it would be prevented from doing so by its own patent granted to Egerton. That would present the case of estoppel against estoppel, which Lord Coke says setteth the matter at large.† No one can set up an estoppel against his own grant. Whoever else, therefore, might set up the estoppel against Egerton's title to the lot in question, the government could not do so. Its own patent would stand in the way. And whatever the government could not do, its subsequent grantees could not do.

It is suggested that Egerton's grantee, who procured the act of Congress and a patent for another lot, represented Egerton, and by his acts bound Egerton in the same manner

---

* 2 Smith's Leading Cases, 702, 748, ed. 1866.

† Coke Littleton, 352 b; 2 Smith's Leading Cases, 658 [584].

as himself. But this may well be questioned. He could bind himself by his own acts; but he could only bind Egerton to the extent of Egerton's deed, and the effect of that has been fully considered. Egerton never asked the government for another patent, nor did he authorize his grantee to do so. The transaction which took place between that grantee and the government was, as to Egerton and his grantees of the lot in question, *res inter alios acta.*

The conclusion to which we have come on this part of the case is, that there was no estoppel shown by the evidence which would prevent the defendants from showing the truth of the case, as to which quarter-section was actually granted to Giles Egerton by his patent of January 10th, 1818.

This is, therefore, the next question to be considered. Had the patent itself been exhibited on the trial, it would have ended all controversy on the subject. But it was not exhibited, and it did not appear what had become of it. An exemplified copy, however, of the record of it, as it remains in the archives of the General Land Office, was produced. This showed that the patent was for the northeast quarter of section 18, being the lot in controversy. It was also shown from the same records, that this lot had been duly entered in favor of Egerton, under his military land warrant, on the day of the date of the patent. It was further shown, that the southeast quarter of section 18 had three days before been patented to another person, Durney. This cumulative evidence seems irrefragable to the effect that the patent was in fact given for the lot in controversy.

Against this evidence, we have only, first, the description in the deed from Egerton to Hart, where the word "southeast" is used instead of "northeast;" secondly, the memorandum in the margin of the record, and thirdly, the recital in the act of Congress. As to the first, it is a kind of variance which so frequently occurs by mistake of the scrivener (as every surveyor and land lawyer knows), that it is scarcely worthy of a moment's consideration, when opposed to the record of the patent. As to the second—the memorandum made in the margin of the record—it is not known when it

was made, except that it must have been after the 19th of May, 1826, the date of the letter referred to in the memorandum itself, which was eight years after the date of the patent; nor is it known who made it, nor on what evidence it was made. Such a memorandum, being no part of the record itself, cannot be received to contradict the record. It would be a very dangerous precedent to allow it to have that effect. It is not the record of any act of the department, nor of any document entitled to registry in its archives. It is nothing but a memorandum of a third person, and hearsay evidence at best.

As to the recital of the statute, whilst the recitals of public acts are regarded as evidence of the facts recited, it is otherwise, as we have seen, in reference to private acts. They are not evidence except against the parties who procure them.* The statute in question is a mere private act, and cannot be received as evidence, except as against the person who procured it, who was not Egerton, but his remote assignee under the Hart deed. It can only be used as evidence against the person on whom it acts as an estoppel.

We conclude, therefore, that the charge of the court below was erroneous, and that the judgment must be REVERSED, with directions to award a

VENIRE DE NOVO.

---

* 2 Phillips on Evidence, 106, 6th Am. ed.