SINSHEIMER et al. v. SIMONSON et al.

(District Court, D. Kentucky. September 20, 1899.)

No. 108.

BANKRUPTCY—PETITIONING CREDITORS—ESTOPPEL.

Where a debtor made a general assignment for the benefit of his creditors, and the assignee qualified and brought a suit in the proper state court for the settlement of the trust under the direction of the court, and within four months thereafter certain creditors filed a petition in involuntary bankruptcy against the assignor, alleging such assignment as an act of bankruptcy, *held*, that they were not estopped to maintain such petition on any or all of the following grounds: (1) That, having knowledge of the assignment and of the acts of the assignee thereunder in conducting the business and selling the stock on hand, they delayed instituting proceedings for two months; (2) that, pending a proposition for compromise, they sold to such assignee for cash small bills of goods to replenish the stock and make it more salable; (3) that they submitted to the assignee, at his request, unverified statements of their claims, for the specific purpose of comparing the same with the entries in the insolvent's books; (4) that an order made by the state court for the sale of the assignor's goods was submitted to the attorneys for the said creditors, and by them indorsed "Seen."

In Bankruptcy. Petition for adjudication in involuntary bankruptcy.

Kohn, Baird & Spindle, for petitioning creditors.

M. A., D. A. & J. G. Sachs, Humphrey & Davie, and A. E. Wilson, for respondents.

EVANS, District Judge.   This court in March last, for reasons stated in the opinion then announced (92 Fed. 904), refused to permit the filing of the answer then tendered by the defendants.   The time for answering had previously expired, and the court, upon that as one of the grounds and in the exercise of its discretion, thought the answer should not be filed.   This discretion was largely influenced by the view that the answer did not state a defense, and possibly by some suspicion that its averments were exaggerated.   Overruling this exercise of discretion upon appeal by one only of the alleged bankrupts, namely, D. G. Simonson, the circuit court of appeals reversed this judgment.   95 Fed. 948.   In its opinion the court said:

"Coming to apply our conclusions to the case at bar, we cannot doubt that the answer tendered made a case of estoppel against the petitioners.   They are alleged to have become parties to the assignment proceedings, to have filed their claims under the assignment, and to have requested a reference to pass upon their claims, the accounts of the assignee, and the questions of distribution.   They waited three months and a half before filing their petition.   By their acquiescence, they certainly induced the assignors, the assignee, and the purchasers of the assets from the assignee, to believe that they would not seek to set aside the assignment.   Were the assignment to be set aside now, it would avoid every sale the assignee has made, and revest in the trustee in bankruptcy the title of the assignors.   It is conceded that the distribution, under the assignment, would be exactly the same as under the bankruptcy proceedings.   The bankruptcy proceedings will only increase the costs, and possibly defeat the payment of the costs already earned in the state court proceedings.   Had these creditors filed their petition soon after the assignment, all the unjust results of their delay pointed out would have been avoided; for then the assignee would not have sold the assets, and the state officers would not have rendered the services, and the creditors would not have distribution delayed by four months."

Since the return of the case issues have been formed, and upon the trial the evidence was heard orally before the court, and much latitude was purposely allowed.   It took a somewhat wide range, but the hearing gave the court good opportunities for weighing it, and forming some conclusion as to its value and credibility.   It did not escape attention that only one of the alleged bankrupts testified, although the others were present in court, and he seemed to have less interest in it than might have been expected.   He alone had taken the appeal, he alone had sworn to the original answer, and he alone, by the later pleadings, has raised the issues now to be determined.

In passing upon the questions involved, the circuit court of appeals had necessarily assumed that the averments of the answer were true, and, being so, it was held that the facts stated would estop the petitioners from claiming the relief prayed for in the petition.   But in an amended answer, filed by D. G. Simonson since the return of the case, one, at least, of the material averments upon which the circuit court of appeals had acted was withdrawn, and on the trial there was not even an offer to prove either that the petitioners had become parties to the assignment proceedings in the state court, or had filed

their claims under the assignment in any legal or statutory sense, or had requested a reference to pass upon the claims, the accounts of the assignee, or the questions of distribution. The allegations of the answer on these points were entirely abandoned, and in lieu of the claims set up originally others have been substituted, thus making practically an entirely new defense. The court might comment with some plainness upon the new situation thus developed, particularly in view of the utter failure of proof upon the facts assumed to be true in passing upon the case in the circuit court of appeals, by reason of the unfounded assertion of which considerable damage has probably resulted to the estate in the way of continued rentals, and to the creditors in the way of interest and delay. But, passing this phase of the case, stated in general terms the claims now set up by the defendant D. G. Simonson are—First, that the petitioners are estopped because they knew of the assignment, and of the acts of the assignee thereunder, in conducting the business and selling the merchandise on hand, and yet, with this knowledge, delayed instituting the proceedings for over two months; second, that soon after the assignment, and with knowledge of it, the assignee purchased of one of the petitioners $287.04, and of another $250.25, worth of goods to replenish the stock, and make it more salable, and paid the cash therefor; third, that the assignee, soon after accepting the position, notified the petitioners of the assignment, and requested them to send to him a statement of their claims, which they did; and, fourth, that, after the assignee had instituted an action in the Jefferson circuit court, an application to that court was made by his counsel for directions to sell the remnant of the stock of merchandise on hand, fixtures, etc., and upon the order entered in the case respecting this matter the following words, before its entry, were written, namely, "Seen. Kohn, Baird & Spindle;" and it is also claimed that the costs and expenses of administering the estate in this court will be as great as in the state court.

Upon this substituted contention of the defendant D. G. Simonson, the issues were formed, and the court has been in some doubt as to the proper practice,—whether to make findings of fact, or whether to file a full stenographic report of the evidence, and, treating it as the depositions of the witnesses, make it part of the record. As being best in this particular instance, the doubt will be solved by doing both.

First, however, it may be well to dispose of one phase of the case. On February 14, 1899, this proceeding was brought by Sinsheimer, Levenson & Co., Freeman Bros., and N. Snellenburg & Co., three creditors whose claims aggregated about $10,000. On April 1, 1899, the Louisville Banking Company, A. Meinecke & Son, the Kenton Hardware Manufacturing Company, the Scotland Neck Cotton-Mills Company, and Rowe & Cronin, five creditors whose debts aggregated about $20,000, filed another petition, having for its object the same relief as was asked in the first proceeding, and based upon the same alleged act of bankruptcy. Before the hearing, the court directed that the five last-named creditors should be added as petitioners in this case, and then entered an order consolidating the two proceed-

ings into one. At the hearing it was clearly shown that the five last-named parties had either proved and filed their claims in the state court proceeding, or had voluntarily become parties to it. Upon this state of fact, under the rule established in this case by the circuit court of appeals, those five petitioners are estopped from claiming the relief sought. They will not hereafter be regarded as petitioners. Only the three creditors who joined in the petition first filed will be treated as such.

Limiting its consideration to them, the court, upon the evidence, finds the material facts to be as follows, namely: On December 5, 1898, the co-partnership firm of Simonson, Whiteson & Co., composed of D. G. Simonson, I. Whiteson, and Leo Stern, being then insolvent, executed and delivered to L. Comingor, their head bookkeeper, a general assignment for the benefit of their creditors, which, being recorded, was accepted by said Comingor, who, pursuant to law, qualified and entered upon the discharge of his duties. On December 7th, the assignee mailed to creditors of the assigned firm a request that they send a statement of account, so that he could see if it agreed with the firm's books. Pursuant to this request, two of the petitioners mailed statements, but did not prove their claims, nor make the affidavit upon them required by Ky. St. §§ 90, 3870. On December 8, 1898, the assignee instituted an action against the debtors in the Jefferson circuit court, common pleas division, for the purpose of having his trust administered and settled under the direction of that court. The trustee's counsel in that action were the firm of M. A., D. A. & J. G. Sachs, who were also the counsel of the firm of Simonson, Whiteson & Co. Subsequently an application was made to the court in that case by the said firm's attorneys for an order directing the sale of the remaining portions of the merchandise and the fixtures in the store, and, pursuant to a promise made under the circumstances detailed in the evidence, the judge of that court would not enter the order until the law firm of Kohn, Baird & Spindle had been informed of it. The proposed order was shown to D. W. Baird, a member of the latter firm, by D. A. Sachs, but all concern in the matter, and all purpose to interfere in it, were then disclaimed by Mr. Baird, who at first refused to have anything to do with it. However, at the earnest request of Mr. Sachs, he finally wrote upon it the words, "Seen. Kohn, Baird & Spindle." This was done for the accommodation of Mr. Sachs, and upon his assurance that otherwise he would have more trouble in getting the order. On the 9th day of December, 1898, a committee of the Eastern creditors of the firm reached Louisville, and, after looking over the ground and the books of the firm, agreed to advise creditors to accept an offer of settlement at 50 cents on the dollar. A writing was drawn for creditors to sign, agreeing accordingly, but it was, by its terms, not to be binding unless 90 per cent. in value signed it. A large number signed, but not 90 per cent. of them. The whole indebtedness was about $110,000, the gross assets something over $90,000, without excluding the expense of reducing them to cash, and one of the largest creditors was the Louisville Banking Company, whose claim was about $19,000. It failed to enter into the agree-

ment. Pending the effort to effect this settlement, the assignee continued to sell the merchandise without objection from the petitioners, who knew of it, and who hoped to see enough realized therefrom to pay the 50 cents in cash, if the creditors agreed to that plan of settlement, and he ultimately sold the remainder of the stock and the fixtures under the order referred to. Soon after the assignment, and while the effort to effect a settlement was in progress, the assignee, in order to replenish stock and make it more salable, found it wise to purchase certain new goods. For that purpose he purchased of Sinsheimer, Levenson & Co. $287.04 worth, and in like manner purchased of N. Snellenburg $250.25 worth, and paid cash to both. When the committee visited Louisville, in December, 1898, they were intent upon effecting the settlement, and concerned themselves but little, if at all, about the assignee or his work; but in the meantime the petitioners directed their counsel to prepare, and about December 10th they did prepare, the petition in bankruptcy ultimately filed in this proceeding. The defendants and their counsel were notified of this fact, and of the purpose of the petitioners to institute this proceeding, unless the proposed settlement was accomplished. The petition was not filed at an earlier date than February 14, 1899, because of the repeated assurances of the defendants' counsel that they would be able to get the requisite 90 per cent. of the creditors, and because the petitioners' counsel were repeatedly requested by the defendants and their then counsel to delay filing it to see if the compromise could not be effected. The petitioners had agreed to the terms of compromise, upon the conditions stated in it. The petitioners were not parties to the assignee's suit in the state court. They did not file their claims under the assignment. They did not request a reference to pass upon the claims, nor the accounts of the assignee, nor the question of distribution. They did not, nor did either of them, prove their claims, nor make affidavits to them, as required by the Kentucky Statutes, but, at the request of the assignee and for his accommodation, two of them sent a mere statement, for the express and only purpose of enabling the assignee to see if their claims agreed with the company's books. What the petitioners in fact did was to delay action in this court until it could be seen whether there could be a settlement, not through the assignment, but independently of it and outside of it. They did nothing showing active, positive, or other consent to the assignment. Their efforts were to secure a settlement independently of it. Failing in this, they sued within four months after the assignment was made. The defendants' then counsel were, at the outset, confident of getting the Louisville Banking Company to agree to the proposed compromise, but there is more than a suspicion that the storm center in this whole trouble was around the effort of the defendants' then counsel to secure a large fee for themselves. Indeed, when listening to the testimony, it was impossible to resist the conviction that those attorneys were the real litigants, using the name of one, but only one, of the alleged bankrupts. The expenses and costs of winding up the estate in the state court, outside of those necessary to reduce the assets to cash, which would probably be the same under each jurisdic-

tion, will greatly exceed those incident to winding it up in bankruptcy. Under the bankruptcy act, the fees and expenses, except attorney's fees, are plainly fixed, and in the aggregate, including counsel fees, would probably be less than $3,000. In the state court, however, besides considerable court fees and costs, they would include a large fee, probably $3,500, to the assignee's attorneys, another $3,500 to the assignee himself, at least $250 to the commissioner of the court for passing upon the claims and computing dividends, and a much larger sum for rentals, after allowing for the $4,000 realized by the assignee. The rent of the premises in which the defendants did business was over $13,000 per annum. It is not shown how long a lease they still hold, but their term had not expired. If it be true, as this court has held in Re Jefferson, 93 Fed. 948, that the adjudication in bankruptcy dissolves the relation of landlord and tenant, the last item above enumerated would not have been a charge upon the estate in this court, as it must necessarily be in the state court, unless a new tenant can be found.

These being the material facts, the question for the court to determine is, are they, together or separately, sufficient to estop the petitioners from insisting upon the right given to them as creditors by the express provisions of the bankruptcy act? It seems to the court that sound judgment and just principles of law demand a negative answer, unless the opinion and judgment of the circuit court of appeals in this case require otherwise. But, as we have seen, the case now under consideration is not the one passed upon by the appellate tribunal, but an entirely different one. And it may be well to observe that, when this case was first before the court, the question of estoppel was not argued. Counsel laid the stress of their case upon other grounds, and in passing upon it the court, probably unfortunately, treated the question somewhat after the manner of counsel. And, indeed, the question of estoppel has turned out to have been altogether a moot question in the case until now. However, in considering it, we are to be guided by the ratio decidendi of the court's opinion. If correctly apprehended, this was that a creditor of an alleged bankrupt, who made a general assignment for the benefit of his creditors, could not first claim under the assignment, and then against it; that if he procured the making of the assignment, or if, after it was made without his procurement, he consented to it, by proving his claim under it, or if he asserted his claim in a suit for a settlement brought by the assignee, or if he entered his appearance in such a suit, or if in any manner he actively asserted his claim under the assignment, he was estopped from availing himself of the right of action given him by the bankrupt law. It must be conceded that these general principles are correct, but the court is clearly of opinion that the facts of this case do not bring it within them.

While, upon principles entirely correct, it can be held that a party has estopped himself from asserting a right against another, whether it be founded upon a contract or a statute, yet in passing upon the question the court should not exclude any person from a right given by congress, except upon the strongest reason, nor in

considering the subject should certain essential propositions be disregarded or overlooked. The constitution gives to congress the exclusive power to establish a uniform system of bankruptcy. Congress has done so by the existing statute upon the subject. The courts may interpret that statute, and ascertain the meaning of its language, and may, in proper cases, enforce estoppels, but they are without power to add to its provisions. By section 3 it is provided, absolutely and without qualification or condition, that "acts of bankruptcy by a person shall consist of his having  *  *  *  (4) made a general assignment for the benefit of his creditors"; and, further, that "a petition may be filed against a person who is insolvent, and who has committed an act of bankruptcy, within four months after the commission of such act." By section 59, cl. B, it is further enacted that "three or more creditors who have provable claims against any person which amount in the aggregate, in excess of the value of securities held by them, if any, to five hundred dollars or over, or if all of the creditors of such person are less than twelve in number, then one of such creditors whose claim equals such amount may file a petition to have him adjudged a bankrupt." These provisions giving rights are not to be disregarded upon light or trivial grounds, nor has the circuit court of appeals so intimated. If the doctrine of estoppel is to be applied and enforced upon any but the most urgent principles of equity, then, instead of having a uniform system of bankruptcy based upon plain and unequivocal statutory provisions, we shall have those provisions frittered away or not, according to the various or varying notions of the judges as to what should estop a party from the assertion of rights explicitly given by a legislative power, over which the courts have no rightful control.

Granting that, upon the facts as they appeared to the circuit court of appeals, it would be unconscionable for these creditors to throw these debtors into bankruptcy, and that they may, for that reason, be held to be estopped from doing it, still it seems to me it would be entirely inexcusable for the court to say that the petitioners in this case shall be denied their plainly-given statutory right, either because of the insignificant matter of their counsel, at the request of the alleged bankrupts and their attorneys, writing the word "Seen" upon an order in a case to which they were not parties, and with respect to which they had given their counsel neither authority nor instructions, and in which their counsel claimed neither; or because, under the circumstances detailed in the evidence and pending a proposition of compromise, the assignee purchased a small quantity of merchandise from them; or because they sent to the assignee, at his request and for a specific purpose, an unproved and unverified statement of their debts, in order to see if they agreed with the firm's books; or because they delayed, not three and a half months, as suggested in the opinion of the circuit court of appeals, but two months and nine days, to institute proceedings, when the statute, in plain and unambiguous terms, unconditionally gave them four months within which to do it, and extended no power to the courts to curtail or abridge the period; or because the administration of the estate would be more or less

expensive in the state court; or because of all these things combined.

Upon the subject of the costs and expenses, it may be remarked that congress in no way made the right of the creditor dependent upon the relative expensiveness of the two proceedings, nor upon the fact that the assignee had incurred expenses. Logically, that should not, per se, affect the question, and it is not believed that what was said in that connection by the circuit court of appeals in its opinion in this case was meant to be more than an illustration to enforce the views it had expressed upon the other facts appearing to be true when the case was before it. That this is the correct view may be assumed from the circumstance that the remarks in that connection of the learned judge who delivered the opinion were probably not necessary to a decision of the question of estoppel based upon the allegations of the pleadings before the court. Otherwise, we should have to assume that the appellate court meant to assert the power of the courts to say that, when congress declared the creditors should have four months in which to get others to act with them, and then elect whether they would sue in bankruptcy, it only meant that they should have this right provided no expenses had been incurred in the state court, or that the expenses in this court did not exceed those of the state court. The court could not have so thought, because, while petitioners in cases like this may be estopped by some act of their own, the doctrine of estoppel could not be made to rest upon the question of the costs of the proceedings here or elsewhere; and especially should the petitioners not be estopped from doing what would clearly decrease the cost and expenses of winding up the bankrupt's estate, which is known to have been one of the objects congress intended to achieve.

Coming to the question of acquiescence, it seems to the court that the creditor has the right to ascertain all the facts, and consider them for the statutory period, before he is bound to act, or lose any right by mere nonaction, and he may at any time within four months sue, unless meanwhile he has done some positive act (such as those which, without warrant, were imputed to petitioners by the original answer) which would make it inconsistent with good faith for him to claim the right the law gave him. If he did this, the four-months period would no longer concern him, as the estoppel would work from the time he did the things which estopped him. Otherwise, the law expressly gives him the right to remain silent for four months, and then to sue within that period. This being so, his mere silence, even with full knowledge of all that the assignee is doing, cannot defeat him. The law gives him the right to acquire information, and to silently acquiesce four months, and he should not be estopped by exercising this statutory privilege.

It seems to the court that the doctrine of estoppel in this connection must be based upon the idea that the creditor has in some positive way ratified the assignment. Ratification, or some act which is equivalent to it, must be the basis for applying the doctrine. It would rarely be fair or just to impute ratification to a creditor in a case of this character unless he had shown some intention to

agree to the assignment, or had done some act which the court could fairly hold should require that such an intention should be imputed. Instead of that, in this case the intention of the petitioners was always clearly manifested never to claim under the assignment, but to file their petition in this court, unless there was a settlement independent of the assignment. Surely, it is fair to assume that, when the bankrupt act was passed, congress had it in its contemplation that assignments would be made; that assignees would accept the trust, and enter promptly upon the discharge of their duties; that they would preliminarily ask for a statement of claims against the estate; that they would sell assets; that creditors would look into their conduct, and consider what was best to be done; that there would be purchasers of the assets; that there would be expenses of administration incurred; that assignees would meanwhile act upon the assumption that the assignment was valid; and that all the usual things would take place,—yet in plain terms that body enacted the bankruptcy legislation, which the courts can only interpret when doubts arise as to its meaning, but to which they can properly add nothing. With all these matters in its contemplation, congress did not add any proviso or condition to cover the contention in this case. And so we say again that, while the doctrine of estoppel should be applied to litigants in bankruptcy in proper cases, it should not be done upon slight or trivial grounds, and only that sort are believed to exist in this case. If it be otherwise, where will the line be drawn which will save creditors any of the rights given by the statutory provisions we have cited? The statute gives the creditor four months within which to elect intelligently, and his silence, even with that perfect knowledge of all the facts which he is given four months to acquire, cannot lawfully deprive him of his statutory right. Nothing can do that, unless he does some positive act of claiming under the assignment, or asserting a right under it, or in some way actually ratifies its provisions, or does some act which, upon equitable principles and in good conscience, would make it wrong for him to overthrow an instrument he had thus actually agreed to. Hence it will be found that in all the cases there were acts of positive consent or of assertion of rights under the assignment,—something more than a silent failure, even with perfect knowledge of all that had been done, to take any position during the period given by express law for consideration and election. The statute does not say that time shall be shortened by an earlier acquirement of knowledge of all the facts in the case. Congress fixed the period at four months. It recognized that the creditor during that period may be in more or less of a dilemma, and it recognized that it would be harsh, unjust, and unwarranted to say that slight acts, even of mere precaution, while this dilemma lasted, should estop him. Indeed, in this case it seems to the court that, if there is any ground for estoppel, it works against the defendants, and not the petitioners. It was the then counsel of the defendants who requested the writing of the word "Seen" upon the proposed order in the state court, by Kohn, Baird & Spindle, and it should not be overlooked that this was in no

588 96 FEDERAL REPORTER.

sense an appearance, nor did it purport to be an appearance, of anybody, much less that of the petitioners, who are in no way named in it. It was the same counsel who repeatedly requested the delay in filing the petition in bankruptcy. The delay was the result of that request, and not of any ratification by petitioners of the assignment. It was by the request of the assignee that two of the petitioners sent statements of their claims for the. information of the assignee, and upon which nothing else could have been done in that condition, as they were neither proved nor verified, as the law required. This was an inconsequential act, done for a particular purpose, at the assignee's request, while the proposition of compromise was pending, and without the slightest intention of consenting to anything except the request. In making the request, the assignee was in no sense complying, or meaning to comply, with section 90 of the Kentucky Statutes, nor were the creditors in any just or legal sense proving or filing their claims. It was upon the application of the assignee that the state court authorized the purchase of the small bills of goods to replenish stock, and make it more salable, and it was also upon the request of the assignee that the two petitioners sold him the goods, when it was expected that a compromise would soon be obtained. It is a familiar rule that "the assertion of an estoppel may be prevented by the existence of an estoppel by deed or by matter in pais against its use," and also that "an estoppel against an estoppel sets the matter at large." Branson v. Wirth, 17 Wall. 42; 7 Am. & Eng. Enc. Law (1st Ed.) pp. 5, 25; Herm. Estop. § 578. Setting the matter at large would mean, in this case, that no just obstacle has been interposed to the granting of the relief sought. It seems to the court that it would be grossly unjust and unfair, at the demand of the defendants together, or of the defendant Simonson alone, if he is the only litigant, to hold that the petitioners are estopped in this case for doing what they had been requested to do by those now insisting upon the estoppel; and the court has no doubt that granting the prayer of the petition will greatly redound to the interest alike of the alleged bankrupts and their creditors (for whom alone the bankrupt act concerns itself), however much it may disappoint others.

It may be proper to observe that, whatever may have been the practice elsewhere under the old bankrupt act, in this district there was never any difficulty in adjusting, upon a fair and equitable basis, the accounts between the trustee in bankruptcy and the assignee in the state court. And it should not be forgotten in such cases that the state assignee, and all who deal with him, have full notice of the provisions of the bankrupt law and of the rights of creditors thereunder. To entirely exempt them from the consequences of this notice would be to repeal quoad hoc the bankrupt act itself. And it would be a most strained conclusion which attributed the costs of the state court proceeding instituted within three days after the assignment, or the expenses of the assignee, to any act of the petitioners. The assignment was made without their consent, and the suit was brought wholly without their aid. At all events, in the opinion of the court, the evidence has developed no

case for depriving these creditors of their right to insist that the general assignment of the defendants was an act of bankruptcy. The court thinks it was an act of bankruptcy, and an adjudication will be made accordingly.