**S. D. ROREM, Appellant,**

v.

**HALLIBURTON OIL WELL CEMENT-
ING COMPANY, Appellee.**

**No. 16567.**

United States Court of Appeals
Fifth Circuit.

June 28, 1957.

John Barry, La Jolla, Cal., for appellant.

Tarlton Morrow, Houston, Tex., Dan Moody, Austin, Tex., Robert O. Brown, Duncan, Okl., Vinson, Elkins, Weems & Searls, Houston, Tex., of counsel, for appellee.

Before BORAH, RIVES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

In this appeal from adverse judgment entered for Halliburton Oil Well Cementing Company, the defendant, on a special issue verdict of the jury, the basic question is whether the conflict in the verdict is such as to require reversal either for remand and a new trial, or rendition here for Rorem, the plaintiff. Presented also is the question of the validity and the effect of the exculpatory work-order contract. The suit was for loss of Rorem's wildcat oil well then being drilled in Bastrop County, Texas, caused by negligence of Halliburton during a squeeze [1]

---

1. The "squeeze" comes from the fact that by the use of a device (packer) that part of the oil well hole where a leak exists can be sealed off to permit introduction of cement slurry under high pressures (1,000 psi or more) to force it into the fracture for hardening as a permanent closure.

Here the well was bottomed at 5,104 feet. From zero to −2300 feet, the casing was 7 inch OD (cemented in), and from −2300 to bottom, it was 5½ inch OD with no cement between the outside of the casing and side of the hole. The leak had been located at approximately −4050. Halliburton was called to do a cement squeeze job to close off this leak.

The annular space (between the casing and the drill stem tubing, 2½ inch OD) as well as the inside of the drill stem tubing was filled with the usual drilling fluid.

A patented production (not cementing) packer fastened onto the bottom of the tubing was lowered down through the casing and set at −4000 feet. This packer may be set at any desired depth. It is set by rotating the tubing to which it is attached. This throws out or expands its buttons, cups or valves, and seals off the space between the tubing and casing. A steel wedge is forced out of the packer against the casing, which holds the packer firmly in place. It can be released

job in (1) allowing cement to get above the packer and (2) giving false assurances that cement had not gotten above the packer, so that the precautionary procedure of reversal of circulation was unnecessary.

by raising the tubing 20 inches, and when released, freely moves up and down in the casing. When set, it is impossible for any liquid to pass into the annular space between the tubing and casing above the packer. The liquid goes on down the tubing and into the casing below. By raising it less than 20 inches, it remains set, but ports in the mandrel, immediately above the packer, are open, permitting fluid to pass from the tubing through the ports and into the annular space. By the use of the packer, leaks in casing are accurately located by moving the packer up and down the casing and applying pressure. When pressure is applied on the annular space with the packer closed and does not leak off, the leak is below the point where the packer is set. By applying pressure on the tubing with the packer set, if it does not leak off, the leak is above the point where the packer is set.

In a cement squeeze job, the line from the Halliburton pumps (located on a mobile unit) is connected with the tubing at the derrick floor to enable the cement slurry to be introduced under pressure below the packer. The job is done in two principal stages (1) "spotting" and (2) the "squeeze" itself. By calibration tables, the Halliburton Cementer calculates the number of barrels of fluid (here, one barrel equaled 172 feet) required to displace all fluid then in the tubing. A part of this replacement fluid will be the cement slurry whose quantity depends on the number of sacks of Portland cement considered necessary for the job. To clear the tubing of drilling fluid, a slug of water (here, 5½ bbls.) precedes the slurry. In the "spotting" phase, the object is to force the slug of cement slurry down into the tubing to a point which would leave an adequate margin of safety above the packer (here, 500 feet). To displace this drilling fluid in the tubing for these slugs of water and slurry, it is necessary that the ports in the mandrel of the packer be open allowing the displaced drilling fluid to get into the annular space (between tubing and casing) above the packer. Since this is likewise filled with drilling fluid, the valves in the Larkin Head at the top of the casing must be open to allow this liquid to escape. When the slug of cement slurry is spotted, the Halliburton pumps are

By special issue verdict, Fed.Rules Civ. Proc. rule 49, 28 U.S.C.A. the jury found that the cement got into the annular space (between tubing and casing) above the packer because Halliburton's Cementer pumped in too much water [2] rather

stopped. The ports of the packer are then closed.

The actual squeeze commences when the Halliburton pumps are started and exert pressure on the liquid in the tubing thus forcing the slurry down through the packer and, following the lines of least resistance, into the fracture or leak.

If, in the "spotting" process, too much water is pumped into the tubing behind the slurry, the cement will be forced through the packer and into the annular space above the packer where, if allowed to harden, it may, as here, destroy the well for inability to remove or drill through the packer.

The general practice is that after the squeeze is completed, circulation is reversed. That is done by again opening the ports of the packer and, by use of the pumps on the well connected to the Larkin Head, forcing drilling fluid down the annular space in and through the packer ports and thence up through the tubing. This may be easily done without ruining the squeeze and assures removal of any cement which may have gotten into the annular space above the packer.

2. Rorem gave instructions to spot the cement slurry 500 feet above the packer (approximately –3500 feet). The Cementer first pumped in 5½ barrels of water to be followed by a total of 8 barrels of cement slurry (40 sacks). Shortly after starting up, Rorem and his driller became apprehensive that cement was being forced up into annular space. The Cementer advised them that the cement slug was then about –1300 feet, and that there was approximately 2700 feet yet to go. Still concerned, Rorem checked again when the Cementer advised that 2½ barrels (approximately 500 feet) were yet to go and continued pumping until ¾ barrel remained when Halliburton pumps were stopped on Rorem's order. The Cementer insisted that the cement slurry slug was then more than 500 feet above packer.

The packer was then closed and within 15 to 20 minutes the fluid in the annular space was put under 1,000 psi pressure from the well's pumps. This pressure was held for some time before and throughout the squeeze and for hours thereafter indicating, as the jury im-

than, as claimed by Halliburton, either through the process of equalization of the two columns of fluid (in the tubing and annular space), or malfunctioning of the packer during the squeeze.

The jury also answered that this negligence was the proximate cause of Rorem's damage, although it found that the well would not have been a producer and had no market value prior to the commencement of the squeeze operation.

The jury, however, with respect to the second ground for recovery, did not return a clear-cut verdict. And it is here that the serious question presented on the appeal arises. For while the verdict on this phase would not itself support a judgment for the plaintiff and thus give him two strings to his bow, it would, if not mutually contradictory, destroy the plaintiff's recovery as a finding of contributory negligence on Rorem's part.

There was evidence from which the jury could conclude that, whether in one or two or more conversations, Rorem asked the Cementer whether in the spotting phase any cement had gotten above the packer in the annular space, and to which inquiries, the Cementer replied positively that none did, and because of that it was not necessary to reverse circulation. There was also evidence from which the jury could infer that the Cementer had said that he was personally of the opinion that no cement had gotten into the annular space, but that if there was any question about it, it would be well to reverse circulation.

The jury, by its answers [3] to Issues No. 10, 11, 12, 13, 13–A, 14 and 15, apparently found all these things.

But on this record, we do not think that there is actually any significant conflict. We conclude that the jury was en-

pliedly found, that the packer functioned satisfactorily.

The squeeze was then done under pressure (700 to 1000 psi maximum) from the Halliburton pumps. Circulation was not reversed. Rorem attempted to pull the packer some hours later, but it was stuck by cement in the annular space for a thickness of 165 feet above the packer. Salvage efforts ($27,000) were unavailing.

The jury expressly found against Halliburton's contention that the cement slurry got above the packer from equalization from excess of weight of cement slurry over weight of drilling fluid in annular space during the 20-minute period between the shutdown of "spotting" and beginning of the "squeeze."

3. "No. 10:—Do you find * * * that the Halliburton's cementer assured * * * Rorem, after the cement squeeze job was completed, that it was impossible for any cement to have pass through the packer and up into the annular space and it was not necessary to reverse circulation?
"Answer 'yes' or 'no'.
"Answer: Yes.
"No. 11:—If you have answered * * No. 10 'yes' * * * then answer * * "Do you find * * * that the cementer then knew that circulation should be reversed to properly protect and safeguard the well?
"Answer 'yes' or 'no'.
"Answer: Yes.

"No. 12:—If you have answered Nos. 10 and 11 'yes' * * * then answer * * *

"Do you find that the cementer's assurance that it was not necessary to reverse circulation, if you have found that he then knew that it should be done to properly protect and safeguard the well, constituted negligence?
"Answer 'yes' or 'no'.
"Answer: No.
"No. 13:—If you have answered * * No. 12 'yes' * * * then answer * * "Do you find * * * that such negligence * * * was a proximate cause of the damage to the plaintiff's well?
"Answer 'yes' or 'no'.
"Answer: [not answered]
"No. 13–A:—Do you find * * * that after the squeeze proper had been completed the cemeter stated in substance to plaintiff Rorem that it would be well to reverse circulation as a precautionary matter?
"Answer 'yes' or 'no'.
"Answer: Yes.
"No. 14:—Do you find * * * that the failure of the plaintiff Rorem to reverse circulation or to remove the packer from the well before closing in the well and his action in allowing it to stand for the period of time he did, constituted negligence * * *
"Answer 'yes' or 'no'.
"Answer: Yes.
"No. 15:—If you have answered * * No. 14 'yes' * * * then answer * *

titled to make the several findings and they all add up to a determination by the jury that prudence called for a reversal of circulation which, not being done, then compelled the entry of the judgment for Halliburton.

In this analysis, we start with the jury finding that it was the negligent act of the Cementer in putting too much water in the tubing that caused the damage. This means that either in his calculations in checking the amount of water he then had in his tanks, the amount of fluid previously introduced, or the amount of water pumped in during the spotting stage, the Cementer made a mistake. But he did not think so. On the contrary, each time—twice during spotting and a third time after the squeeze—he was positive in his own mind that he had not put in too much water. Of course, we must look on "too much" in the light of that operation and not that of the needs of a drouth-scorched ranch, but it turns out that the excess was between five and seven barrels of water at the most.

The significant thing though is that the Cementer refused to believe he had made such a mistake and, with self-confidence, he repeatedly so said. And, in so saying, he conveyed all the while the equally emphatic thought (and which Rorem attributed to him in so many words) that since he had not put in too much water, it was not *necessary* (i. e., required) to reverse circulation to remove cement then incapable of being there, even though, as he said, and the jury said he said, it might well be done as a precautionary measure.

The jury's answer to Issue No. 10 was therefore a literal affirmation of what the Cementer, as a witness, had so many times sworn to.

Issue No. 11 stands no differently. For it asks whether he then *knew* that

circulation should be reversed. Of course, he knew that for he had been telling Rorem to do that very thing. Indeed, the Issue (13–A), attacked so vigorously, was but a different expression of this same finding. Obviously if he told Rorem it would be *well* to reverse circulation, it would mean that the Cementer then *knew* what was reasonably to be done. To answer 13–A as the jury did, it could not have answered No. 11 any differently.

This all becomes quite clear when Issues 10 and 11 are read with No. 12 in which the jury finds the Cementer's action was not negligent, and No. 14 (and No. 27) in which, to the contrary, the jury finds Rorem negligent in not reversing circulation.

Here the jury had to canvass more than the narrow controversy over what the Cementer said, or what he said he said, or what Rorem said the Cementer said, or what the driller said Rorem said the Cementer said. There was abundant evidence to support one of Halliburton's primary contentions that amongst oil men engaged in the business of drilling and bringing in oil wells, that prudence called for a reversal of circulation after a squeeze was completed. Presumably accepting this testimony, this led the jury first to answer No. 11 that the Cementer, a man aware of industry practices, knew that circulation should be reversed. More important, it was enough to permit the jury to conclude, as they presumably did, that while he was mistaken in his belief and his mistaken expression of confidence (Issue No. 10), the Cementer's statements were not made for the purpose of misleading Rorem or inducing him not to follow the accepted practice so that when he said both things (Issues No. 10 and 13–A), it was not a negligent act (Issue No. 12). The find-

"Do you find * * * that such negligence on the part of the plaintiff Rorem * * * was a proximate cause of the damage to the plaintiff's well?
"Answer 'yes' or 'no'.
"Answer: Yes."
See also Special Issue No. 27:
"Do you find * * * that the plain-

tiff, at the time the attempt to squeeze was completed, could, by the exercise of reasonable care, have known that cement had passed from the tubing into the space between the tubing and the casing?
"Answer 'yes' or 'no'.
"Answer: Yes."

ing that the Cementer was not, but that Rorem was, negligent was the jury's way [4] of concluding, as they had a right to do, that the obligation remained on the well owner to follow all accepted industry precautionary procedures and a failure to do so could not be excused because another (Cementer) might have made an error.

In the climate of this record, such a conclusion was a reasonable one for the jury. The question was twofold: (1) was this the industry practice and (2) did the circumstances (a part of which included the Cementer's mistaken actions and statements) suggest full resort to it? Of major importance was the second. On it the jury had seen and heard about the driller, so confident that the well had been ruined by cement, that he frantically begged Rorem to pull the packer. This contemporary apprehension was reflected by the packer company service operator whose joint written report with Rorem to plaintiff's counsel omitted any reference to misleading information from the Cementer. The jury also heard Rorem's pre-trial deposition and the contrast of his trial testimony in which he first expressed, but later attempted to minimize, an immediate concern that cement was in the annular space. And, to cap it all, it was Rorem who said that it was he,

not the Cementer, who first brought up the idea of reversing circulation. With all of this the jury may well have been impressed that Rorem knew of the danger of the cement being there and knew better than anyone on the well what could be done and what ought to be done. On this analysis Rorem's insistence on familiar principles [5] that Halliburton cannot say that a customer is negligent for acting upon false or incorrect information furnished by an agent has no application. There was no finding that Rorem's failure to reverse circulation was the result of reliance by him on such statements. Where neither submitted nor requested, the finding is deemed made by the Court in support of the judgment entered, FRCP 49(a), and, as actually submitted, the jury's answers were an implied finding against Rorem on this.

What the jury did in other matters is a further demonstration that this analysis of the process of the jury answers is a reasonable [6] and sensible one free from pedantic, artificial formalism. On many crucial matters where the issue of credibility pitted Rorem against the Cementer or Rorem against Halliburton, the jury frequently rejected the testimony of Rorem. He insisted, and as a witness championed it under oath, that he had a wonderful wildcat well with tremendous

---

4. To record its conclusions the jury had to use the tools furnished, i. e., the issues as drawn with the alternative answers as drawn. This is 'in contrast to the case of answer by general verdict where the alternative variables are stated by the Court in the charge.

5. Restatement, Torts, §§ 303(c), 305; R. H. Stearns Co. v. United States, 291 U.S. 54, 54 S.Ct. 325, 78 L.Ed. 647; Schneider v. Kelm, D.C.Minn., 137 F. Supp. 871, affirmed 8 Cir., 237 F.2d 721; Labbe v. Corbett, 69 Tex. 503, 6 S.W. 808; Flint & Walling Mfg. Co. v. Beckett, 167 Ind. 491, 79 N.E. 503, 12 L.R.A., N.S., 924; 19 Am.Jur., Estoppel, §§ 60, 67; Gray v. Jacobsen, 56 App.D.C. 353, 13 F.2d 959, 48 A.L.R. 583; Gregg v. Von Phul, 1 Wall. 274, 68 U.S. 274, 17 L.Ed. 536; Branson v. Wirth, 17 Wall. 32, 84 U.S. 32, 21 L.Ed. 566; Dickerson v. Colgrove, 100 U.S. 578, 25 L.Ed. 618; Folk v. United States, 8 Cir., 233 F.

177; Black v. Mosk Clothes Shop, Inc., Tex.Civ.App., 99 S.W.2d 343.

6. Ours is not solely a backward look through a rear view mirror. For, on receiving the jury's verdict, the possibility of conflict was recognized and the jury momentarily excused after which the trial judge, familiar with the whole evidence and contentions found no conflict:

"The Court: Gentlemen, it's going to take a little time to check these answers to be sure there are no conflicts. Court will stand at ease while we go back to check the answers.

(Recess)

"The Court: Gentlemen of the jury, the issues submitted to you have been answered under the instructions of the Court, and there is no conflict. Therefore, your answers will be received as your verdict in this case and will be filed with the Clerk of the court."

dollar value. On ample basis, the jury held it was worthless and would never have been a producer. Rorem, on the trial, denied that he signed the work order contract before the work was done, and with two or three variations, insisted that the Cementer, as a sort of after-thought, came to him after the work was done to obtain the signature. The jury found expressly that Rorem signed it before. Rorem denied that the Cementer ever suggested to him that he should reverse circulation. The jury found (Issue 13–A) it literally as the Cementer had testified.

With his categorical statements many times expressly rejected by the jury as it fulfilled its office of resolving credibility clashes, the jury was certainly not required to accept Rorem's major theme, oft repeated, that he was "relying" on the Cementer. The jury could, and a reasonable construction of its verdict shows that it did, conclude that Rorem then knew enough about that well and that operation and the events of that day for him reasonably to be required to reverse circulation, and that had he done so, no damage would have been done.

The jury verdict was therefore consistent when construed in the light of this record. There was ample basis for it, and judgment for the defendant was compelled. None of the other assignments of error have any merit and they are overruled.

In view of this disposition of the case, we find it unnecessary to pass upon Halliburton's further contention that the work order contract similar to that set forth in Halliburton Oil Well Cementing Company v. Millican, 5 Cir., 171 F.2d 426, footnote 1, 428, was a valid exculpatory agreement since it was signed before the work was commenced and, under Texas law, charged Rorem with knowledge of the terms immediately above his signature whether he was aware of them or not. See 10 Tex.Jur., Contracts, § 57. Indemnity Ins. Co. of North America v. W. L. Macatee & Sons, 129 Tex. 166, 101 S.W.2d 553; Associated Employers Lloyds v. Howard, Tex., 294 S.W.2d 706;

Philippine Air Lines, Inc., v. Texas Engineering & Manufacturing Co., Inc., 5 Cir., 181 F.2d 923; cf. Lancaster v. Sanford, Tex.Civ.App., 225 S.W. 808; see 12 Am.Jur., Contracts, § 137; Upton v. Tribilcock, 91 U.S. 45, 23 L.Ed. 203; 2 Corbin, Contracts, § 607. These contentions and related problems are reserved for another day.

Affirmed.