Mr. Justice MILLER.
 

 This is an appeal from a decree of the Circuit Court for the Northern District of. Illinois, in which the appellants here were complainants there.
 

 The subject of the litigation is the legal title to the southwest part of the northeast fractional quarter o'’ section No. 36, in township No. 18, of range No. 2, west, of rhe fourth principal meridian, in the county of Rock Island, Illinois. The course of the Mississippi river at this point is almost due west, and that portion of its waters which flows south of the island of Rock Island, divides the northeast quarter of section 36 into two parts, one of which, the smaller, is south of the stream, and the other constitutes a portion of the Island.
 

 The section was surveyed in the year 1833 by Bennett, the
 
 *555
 
 Government Surveyor, and the survey duly filed in the proper office. The meanders of the Mississippi river, the quarter see- • tion posts, and the area of the fractional quarters, were all given-by the survey. It appeared by it, that the south line of the quarter section impinged upon the river at a point near the centre of the line, and thus divided that part of the quarter which was south of the river into two separate fractions. The computation of this survey gave the contents of the east fraction at 1 ®070 acres, and of the west fraction at 5 t070 acres. It is this latter parcel which is in contest. In April, 1889, Thomas Lindsey made application to the Receiver and Register of the land office at Galena to purchase the land, claiming a right of preemption under the Act of 1838 by reason of cultivation and actual residence thereon, and having established his claim to the ■satisfaction of those officers, he received from them on the 3d day of June, 1839, the proper certificate, stating the receipt of the purchase-money, and that, on its presentation to the Commissioner of the General Land Office, he would be entitled to a patent. Shortly after receiving this certificate, Thomas Lindsey removed with his family, across the river into Iowa, and died on the 14th September of the same year, a little more than- three months after its date. The present plaintiffs are his heirs, and were all, at the time of his death, either minors or
 
 femes covert.
 
 except James A. Lindsey. . No patent ever issued to Thomas Lindsey or his heirs on this entry.
 

 In 1845 David Hawes claimed a pre-emption right under the Act of 1841 for the same fractional southwest part of the northeast quarter of section 36, and in December received the certifi-. cate of the Register and Receiver that he had • purchased and entered it, and on March 1st, 1848, received from the Government a patent.
 

 The object of the present suit is to compel from said David Hawes and the other defendants, who are his grantees, a convey anee to plaintiffs of the legal title thus, obtained by Hawes frointhe Government.
 

 As Hawes took his patent from the' United States with full knowledge of the certificate previously issued to Lindsey, it is
 
 *556
 
 quite clear that upon the facts above stated, without more, the complainants would be entitled to the relief prayed for in their bill. But the defendant Hawes, who alone has answered, sets ' up other facts upon which he relies as a full defence to the claim of the plaintiffs. There are in the record the depositions of some forty witnesses, besides letters and other documentary evidence, all of which have received the careful attention of the Court; although it -will be found that the case must be-decided upon a few facts about the truth of which there is but little conflict. These will be considered as we progress.
 

 On the 9th August, 1845, James Shields, Commissioner of the ' Land Office, set aside the entry of Lindsey, ordered his certificate to be cancelled, and directed the Register and Receiver to hear proof of the right of David Hawes, and to adjudicate his claim.
 

 They accordingly heard .his proof; and gave him the certificate, oh which he afterwards obtained his patent as before recited. It is claimed by the counsel of Hawes that this action of the land >fficers, including that of the Commissioner, was a conclusive md final adjudication of the matters now set up in plaintiffs’ bill, and that the Courts of Law cannot go behind these proceedings to correct any injustice ‘which may have been done to plaintiffs.
 

 ■ The proposition as thus broadly stated, and as necessarily so stated by defendant’s counsel to avail him in this case, cannot be conceded. It appears from the evidence before us, that the ground oh which the Commissioner set aside the entry of Lindsey, was, that there had been a mistake in the survey made by Bennett in 1833, and that by another survey made by order of the Commissioner in 1844, it was ascertained that the house in * which Lindsey resided when he made his claim in 1839, was not on the land for which he received his certificate of entry from the Receiver and Register.
 

 The order for this new survey emanated from the Commissioner of the Land Office June 1st, 1844, and the survey was actually made.in the autumn of that year, five years after Lindsey’s entry, and five years also after his death, and there is no
 
 *557
 
 proof whatever that any of his heirs had notice of this survey, or of any intention on the part of the Commissioner to set aside Lindsey’s entry; but the whole proceeding was
 
 ex parte.
 
 It is true that subsequently, when the claim of David Hawes.to a right to enter this land came before the Register and Receiver, James A. Lindsey seems to have had some kind of notice; but this 'was given him in regard to an attempt on his part to enter this land for himself, on a claim of improvement made by himself, having, as is clearly shown, no relation whatever to the right established by his father, Thomas Lindsey. Nor did the other heirs of Thomas Lindsey have any notice of the proceedings by which David Hawes established his claim before the Register - and Receiver. These heirs were not in any sense parties, to any'of the proceedings, by which the title to the land which their-ancestor had bought of the Government, was vested in David Hawes, and their claim annulled.
 

 Under these circumstances we have no hesitation in holding that the action of the officers of'the land office was
 
 not
 
 conclusive upon their rights, and that a Court of Equity may inquire into the proceedings- by which the title was vested in Hawes, and afford relief if a proper cause for it is shown to exist. That this is the settled doctrine of this Court, a reference to a few ol its decisions will show.
 

 In the case of
 
 Cunningham
 
 vs.
 
 Ashley et al.,
 
 (14 Howard, 377). Cunningham appeared before the Receiver and Register, and claimed the right únder the pre-emption laws, to enter the land \vhich was the subject of controversy. These officers decided that he had no right to do so, and rejected his claim. He again and repeatedly presented his claim, and tendered the' price of th« land. His claim received the consideration of the Commissionei of the Land Office, of the Attorney-General, and of the Secretary of the Treasury, and was finally rejected. ¿The defendants were permitted to enter the land, and receive from the Government patents for it. Justice McLean, in delivering the opinion of the Court, says, that this final decision of the Officers of the Department was the result of twenty years of controversy; and «peaking in reference to the plaintiff’s rights, he says: They
 
 *558
 
 Were ■ paramount' to those acquired under the new location. Those rights were founded on the settlement and improvement in 1821, and on the acts done subsequently in the prosecution of his claim. Having done everything which was in his power to do, the law requires nothing more.” Again: “ So far as the new entries, interfered with the right of complainants, they were void.” “ The officers of the Government are the agents of the law. They cannot act beyond its provisions, nor make compromises not sanctioned by it. The Court decreed that the defendants should convey to Cunningham who had the paramount equity. In this case, which had been long contested, and had received the consideration of the Receiver, Register, Commis-1 sioner, Attorney-General, and Secretary of the Treasury, all of whom had concurred in rejecting plaintiff’s claim, he had never received any certificate nor actually paid any money, yet the Court held that it would look into the equities of the case and set aside the acts of all these officers, because they had erred, to use the language of the Court, both as to the law and the facts to the prejudice of complainant. In
 
 Barnard's Heirs
 
 vs.
 
 Ashley's Heirs,
 
 (18 How., 43), this Court again decided that it would inquire into the facts of a disputed entry, notwithstanding the decision of the Register and Receiver.
 

 But the clearest statement of the rule established by this Court on this subject, is to be found in the case of
 
 Garland
 
 vs.
 
 Wynn,
 
 (20 How., 8). Wynn’s entry, which was the elder, had been set aside, and the money refunded and a .patent certificate awarded to Hemphill, who assigned to Garland, to whom the patent issued. Wynn brought his suit in equity to compel from Garland the conveyance .of the legal title, on the ground that these proceedings were illegal, and that he had the equitable right. Garland insisted that the Circuit Court had no authority or, jurisdiction to set aside or correct the decision of the Register and Receiver, and that their adjudication was conclusive. Mr. Justice Catron, in delivering the opinion of the Court,, says: - “The general rule is that where, several parties set up conflicting claims có property, with which a special tribunal may deal, as between one party and Government, regardless of the rights of others,
 
 *559
 
 the latter may come into the ordinary Courts of Justice and litigate the conflicting claims. Such was the case of
 
 Comegys
 
 vs. Vasse, (1 Peters, 212), and the case before us belongs to the same class of
 
 ex parte
 
 proceedings. Nor do the regulations of the Commissioner of the General Land Office, whereby a party
 
 may
 
 be heard to prove his better claim to enter,’ oust the jurisdiction of the Courts of Justice. IFe
 
 announce this to he the settled doctrine of this Court?'
 
 In
 
 Lyttle et al.
 
 vs.
 
 State of Arkansas et
 
 al., (22 How., 192), the same member of the Court, delivering its opinion, says: “Another preliminary question is presented on this record, namely, whether the
 
 adjudication
 
 of the Register and Receiver which authorized Cloys heirs to enter the land is subject to revision in Courts of Justice, on proof showing that the entry was obtained by fraud, and the imposition of false testimony on those officers as to settlement and cultivation. We deem this question too well settled in the affirmative for discussion.”
 

 We are not now disposed to question the soundness of these decisions, and they clearly dispose of the objection raised by defendants on this branch of the case.
 

 We now proceed to inquire into the grounds upon which the entry of Thomas Lindsey was set aside, and the application of David Hawes to enter the same land was allowed. It appears that some five years after Lindsey’s entry was made, upon the suggestion of Silas Reed, that there was an error in Bennett’s survey of this quarter, the Commissioner ordered a new survey to be made of that section. This survey was made for the Government by George B. Sargent in the fall of 1844. It differed from the original survey in two particulars, namely, that the southwest fractional quarter was found to contain 18i2n30 acres, instead of 5/jo, and the south line of the quarter section was located so far north, as to leave the house in which Lindsey resided, when he made his entry, entirely south of the quarter.
 

 The Act of June 22, 1838, under which Lindsey claimed his right of preemption and made his entry, provides, “ That every actual settler of the public lands, being the head of a family,
 
 *560
 
 over twenty-one years of
 
 age,
 
 who was in possession, and a housekeeper, by personal residence thereon at the time of the passage of this act, and for four months next preceding, shall be entitled to all the benefits and privileges of an act entitled an act to grant pre-emption rights to settlers on public lands.” It is shown by the letter of James Shields, Commissioner of the General Land Office, dated August 9th, 1845, to the Register and Receiver at Dixon, that Lindsey’s entry was set aside by him because, by the re-survéy, Lindsey’s house was not on the fractional quarter in controversy. We are not prepared to admit,-that if the second survey be the correct and proper subdivision of that section into quarters and fractions of quarters, and that by this survey, (though otherwise by the former) the house of Lindsey was found not to be in the fraction pre-empted by him, the Commissioner could/ for this reason alone, set aside, in this summary manner, the sale of the land made by the Gov ernment to Lindsay. It is to be remembered that the original survey of Bennett, was the survey of the Government; that it was made in 1883; that the maps,.plats, certificates, and field notes were all filed in the proper office; the survey approved, and that for ele,ven years, the Government had acted upon and recognized it as valid and correct, and above all had sold the land to Lindsey by this its own survey, received the purchase money and given him a patent certificate, five years before any sugges tion was made of this error. The money thus received by the Government has never been returned, nor do we think it would vary the rights of the parties if it had been actually tendered to him or his heirs. We are of opinion, under these circumstances, that so far as the location of the lines of that quarter. section, affect the question of the precise locality of Lindsey’s residence, as bearing on his right to enter that fraction as a preemption, the Government was bound by the original survey of Bennett.
 

 We do not here deny the right of the Government which has sold land by the acre at a fixed price, to make a new survey before it parts with the title, and if there is more land than
 
 *561
 
 was paid for, to require the deficiency to be paid before it issues a patent.
 

 On that subject we decide nothing, because it is not necfessary in this. case. Lindsey’s heirs were never notified of the additional number of acres found to be in the fraction, nor were they required, or permitted to pay for this increase.
 

 The language of the Act of 1838, already quoted, certainly required of Lindsey that he should have possession, by personal residence thereon, of the land which he entered, and if he had not such residence, or rather such possession, the Commissioner was justified in vacating the entry. But this fact must be deter mined on the basis of Bennett’s survey.
 

 On this point a few facts found among the mass of testimony in the record, about which there is scarcely a dispute, will enable us to form a just conclusion.
 

 The east and west lines which divide a section into north and south quarter sections, are not usually run out and marked by the Government surveyors; but instead of this, as they run the north and south lines, they set up on these lines, what they call the quarter section post’s — that is, they' mark the points where this line should begin and end. When Lindsey was about to make his pre-emption claim, in order to ascertain whether he •resided on this fraction, he procured the County Surveyor of Rock Island County to come and run this quarter section line. Several of the witnesses who were present when this survey was made have testified in the case, and C. H. Stoddard, a practical surveyor of intelligence and candor, as shown by his testimony, also made a survey from Bennett’s field notes since this suit was instituted. Some of the persons present when the survey was made by Baxter, the Surveyor of Rock Island County, looked through the compass and observed where the line struck Lindsey’s house, and a notch was made on his stone chimney where the line was seen to: touch it, which was there when the depositions were taken in this suit, and was identified by witnesses who saw it made. The fair result of all the testimony on ■this point is, that the house in which Lindsey resided was directly on this line, which would intersect the house so as to
 
 *562
 
 throw perhaps the larger part on the other quarter, and a part something less than half, into this quarter.
 

 It is proved that he had another building on
 
 this
 
 fraction wholly, which is sometimes spoken of as his stable, and sometimes as a blacksmith shop, in which he worked at that trade. It is also shown that the ground cultivated by him was exclusively on this fraction, and the proof of its cultivation and enclosure is quite clear. On these facts, was he within the meaning of the statute, in possession of this fraction by personal residence thereon ?
 

 The counsel for appellees has made a vigorous argument in support of the negative of this question. Assuming that Lindsey could not have a residence on both the northeast and southeast quarter sections at one time, and claiming that the case is to be governed by the analogies of a question of domicil in a case of conflicting jurisdictions, he has made an apparently strong case out • of the fact, that the larger portion of the house is on the south side of the line.
 

 ’ This, however, is not a case of domicil under different Governments or conflicting jurisdictions. It is a question arising under the Government of the Unit 'd States, and concerns a construction of one of its most benevolent statutes, made for the benefit of its own citizens, inviting and encouraging them to settle upon its public lands. The Government which made the law, owned both quarter sections, and was indifferent as to which should be sold to Lindsey, provided it was legally done. Lindsey’s house was on both quarter sections. lie lived or resided in all that house. So far as mere personal residence is concerned, we think he may be correctly said to have resided on both quarter sections. The law only required that he should personally reside on the quarter which he claimed to enter, and if he resided on both, then clearly he resided on this one.
 

 But the language of the act makes
 
 possession
 
 the principal matter, and personal residence the qualifying matter. Leaving out the word housekeeper, which is not in question, the qualification of a person who can pre-empt under the act, is one who was in possession by personal residence thereon.” - Now
 
 *563
 
 .¿hat Lindsey wa3 in possession, is shown by his stable or blacksmith shop, by his enclosure and cultivation of the ground, or a part of it. When in addition to these facts, á considerable part of the house in which he and his family lived, was also on this little five-acre piece of ground, may it not be said that he had possession of it by personal residence thereon ?.
 

 We are of opinion that on the true construction of the statute he had. It follows, from what we have said, that the patent certificate issued to Thomas Lindsey was rightfully issued by the Receiver and Register, that the act of the Commissioner in setting it aside was illegal, and did not destroy the right thus vested, that the land was not subject to entry by David Hawes, and that the patent obtained by him, was wrongfully and •illegally issued to him, and that the plaintiffs are entitled to a conveyance of the legal title from him and his co-defendants.
 

 • The decree of the Circuit Court is therefore reversed, and the case remanded to that Court, with instructions to enter a decree in conformity with this opinion.