UNITED STATES of America,
Plaintiff,

v.

CERTAIN PARCELS OF LAND, etc.;
Outer Harbor Dock & Wharf Company;
Goodyear Tire & Rubber Company, Inc.;
City of Los Angeles et al., Defendants.

No. 13204.

United States District Court
S. D. California, Central Division.

May 3, 1955.

Laughlin E. Waters, U. S. Atty., Joseph F. McPherson, Sp. Asst. to Atty. Gen., Richard A. Levine, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff

L. A. Gibbons, Jerry H. Powell, Douglas C. Gregg, A. Andrew Hauk, Sheldon C. Houts, Los Angeles, Cal., for defendant Outer Harbor Dock & Wharf Co.

O'Melveny & Myers, Paul Fussell, Pierce Works, William W. Alsup, Bennett W. Priest, Los Angeles, Cal., for defendant Goodyear Tire & Rubber Co.

Roger Arnebergh, City Atty., Arthur W. Nordstrom, Asst. City Atty., Los Angeles, Cal., for defendant City of Los Angeles.

MATHES, District Judge.

This is an action by the United States to condemn a leasehold in several parcels of land located at Los Angeles harbor. See United States v. Land, D.C.S.D.Cal. 1954, 15 F.R.D. 224. Jurisdiction is invoked under 28 U.S.C. § 1358. [See Id. § 1345.] The ultimate question to be decided is whether the Government is bound to pay compensation for certain improvements affixed to the land being condemned.

The Navy Department constructed the improvements in question—consisting of warehouses, railroad trackage, underground utilities, and earth fill—while using the land for a Naval Supply Depot under the terms of two World War II subleases, now expired, which had been negotiated with defendant Outer Harbor Dock & Wharf Company. The Government contends that these improvements remain the property of the United States, for which no compensation need be paid.

The problems of law involved are such as to require a recital in some detail of the facts as disclosed by the evidence adduced upon the separate trial of the issue as to ownership. Fed.Rules Civ. Proc. rules 71A(a) and 42(b), 28 U.S. C.A.

Since 1912, defendant Outer Harbor has been lessee of the condemned land, originally under a lease from the city of San Pedro and, since annexation, from the city of Los Angeles. The present lease expires on February 13, 1956.

By two separate subleases—the first executed October 1, 1943 for a term expiring June 30, 1944; and the second executed July 15, 1944 for a term expiring June 30, 1945—Outer Harbor subleased this same land to the Navy Department. The first sublease covered three of the parcels; the second sublease covered two of the remaining parcels. Each sublease was by its terms renewable; and each was renewed from time to time until 1950, under certain conditions not here relevant.

Both subleases provided that: "The Government shall have the right, during the existence of this lease, to * * * erect * * * structures * * * in or upon the premises hereby leased * * *; which structures so * * * attached to the said premises shall be and remain the property of the Government and may be removed therefrom by the Government prior to the termination of this lease, and the Government, if required by the Lessor, shall, before the expiration of this lease or renewal thereof, restore the premises to the same condition as that existing at the time of entering upon the same under this lease * * *."

Thus, in short, the Government reserved its property right in the additions made to the premises; it retained the right to remove these improvements prior to termination of the subleases; and it agreed on demand to restore the premises before expiration of the subleases.

By letter of October 27, 1949, the Navy notified Outer Harbor that both subleases would be terminated "during the first half of the calendar year 1950", and called Outer Harbor's attention to the restoration obligation.

On November 23, 1949, Outer Harbor answered, stating that it desired restoration of the demised premises, but that it would waive restoration upon payment of $175,000. On June 5, 1950, Outer Harbor again advised the Navy by letter that it would require restoration. On June 16, 1950, the Navy gave Outer Harbor written notice of termination of the earlier sublease as of June 30, 1950, leaving the removal problem to "be taken up with you by the Commandant." The later sublease expired by its own terms on June 30, 1950.

On June 23, 1950, Outer Harbor notified the Navy by letter that it desired the

buildings and structures removed upon termination of the subleases, but offered to negotiate the matter. By letter dated July 6, 1950, the Navy accepted Outer Harbor's demand for restoration.

While all this correspondence was taking place representatives of the Navy and of Outer Harbor carried on certain significant oral negotiations. Mr. Mead and, to a lesser extent, Mr. Muench represented the Navy, while a Mr. Tilley represented Outer Harbor.

The chain of command and of authority among the Navy's representatives ran from Admiral Jelley (Chief of the Bureau of Yards and Docks in Washington) to Captain Johnson (the District Public Works Officer of the Eleventh Naval District at San Diego) to Mr. Muench (Director of Property Administration at San Diego) to Mr. Mead (Manager of the Real Estate Branch at Los Angeles).

On June 23, 1950, two days before the Navy surrendered possession of the premises to Outer Harbor, Messrs. Mead and Tilley discussed the possibility of transfer of ownership of the buildings by the Navy to Outer Harbor to satisfy the Government's restoration obligation. Because Tilley then pressed for prompt action on formal transfer of ownership of the structures, Mead realized that the arrangement would have to be consummated quickly if at all. He also knew that in transferring ownership of the buildings and in paying $175,000 to Outer Harbor for a waiver of the right to require restoration of the premises, the Navy would be freed of the substantial cost of removal of the buildings, set by the Government's estimate at $288,000 —$113,000 in excess of the proposed payment to Outer Harbor.

On July 11, 1950, Tilley informed Mead by telephone that Outer Harbor would reduce its demand from $175,000 to $155,000 provided a firm commitment be made by the Navy within a week. Transfer of ownership of the buildings was of course an integral part of this offer. Mead promptly informed Muench of the reduced offer, and on the same day Muench requested the Bureau of Yards

and Docks for "authority to inform lessor of Government's acceptance."

Admiral Jelley, the Chief of the Bureau, replied on July 21, 1950: "Authority given to accept offer of settlement of Outer Harbor Dock and Wharf to be conditioned upon release of all obligations and claims including any claim of the Harbor Department as prime lessor."

On July 24, 1950, Muench informed Mead, who in turn informed Tilley, of this grant of authority. Tilley then drew up a letter, setting forth Outer Harbor's reduced offer, and dated it back to July 10, 1950, following which he and Mead went to confer with Muench in San Diego, to consummate the transaction. There, in Tilley's presence, Muench dictated a letter reciting the authority to accept the $155,000 offer and authorizing Outer Harbor to take immediate possession of the premises; and Captain Johnson then signed it on behalf of the Navy.

The understanding thus reached at this San Diego meeting was that from that time on, the buildings belonged to Outer Harbor. It was considered by the negotiating parties that the transaction was completed as far as could be done locally.

The parties also understood, however, that in order to secure payment of the $155,000, written agreements supplemental to the subleases would have to be prepared and sent to Washington. When returned, these supplemental agreements would serve as a basis on which a voucher could be issued and the money paid.

On the following day, July 25, 1950, in execution of this arrangement, the Navy delivered possession to Outer Harbor of all the leased premises including the warehouses.

Further evidence of the authority of the Navy's local representative was given on July 28, 1950, when the Bureau of Yards and Docks in Washington wrote to Outer Harbor that the District Public Works Officer (Captain Johnson) had been authorized "to effect settlement of this matter [the claims arising out of the Government's occupancy under the two subleases] on terms and conditions mu-

tually agreeable to the Government and your Company."

On September 1, 1950, Mead sent to Outer Harbor the proposed supplemental agreements, which set forth the cash consideration of $155,000 agreed on, and a recital of the transfer to Outer Harbor of ownership of the warehouses. Outer Harbor thereupon signed the documents and returned them to Mead.

Following the transfer back of possession of the premises on July 25, 1950, Outer Harbor expended approximately $50,000 to alter and repair the warehouses in order to make them conform to the City's building code. Outer Harbor additionally spent approximately $10,000 in advertising and to compensate real estate brokers for finding a tenant for the warehouses. On September 15, 1950, Outer Harbor leased four of the warehouses to defendant Goodyear Tire and Rubber Company for a period of five years at a monthly rental of $7,624.49.

On September 26, 1950, the Harbor Department sent a letter to Mead stating that "The Government is not obligated to the City in any manner in connection with its use of the subject premises * * *."

On November 15, 1950, Mead sent the supplemental agreements back to Outer Harbor, so that the corporate seal, which had been omitted at the time of execution, could be affixed. After affixing the seal and conforming the termination date to that of the original lease agreement with the City, Outer Harbor again returned the completed documents to Mead.

On November 27, 1950, Muench sent the supplemental agreements, as finally executed by Outer Harbor, to the Chief of the Bureau of Yards and Docks (Admiral Jelley) in Washington. The Bureau of Yards and Docks voiced no objection to the supplemental agreements, but the Bureau of Supplies and Accounts held up formal approval for payment without disclosing any reason. The result is that the supplemental agreements have never as yet been signed by any representative of the Government.

In a circular letter dated January 5, 1951, the Secretary of the Navy directed that the Naval Supply Depot at Los Angeles harbor be re-established as of February 1, 1951. On January 18, 1951, the Bureau of Yards and Docks granted authority to the local Public Works Officer to negotiate "for new leases with property owners including provision for restoration obligations incurred under old leases."

By a letter dated January 24, 1951, Mead requested Outer Harbor's proposed terms for a sublease of one of the warehouses, as well as the asking price for the structure. From about January 15, 1951, to about May 18, 1951, officials of the Navy negotiated with Goodyear for the other warehouses. Because no agreement could be reached between the Navy and Outer Harbor or Goodyear, the original complaint in condemnation in this action was filed on June 14, 1951.

In the original complaint the Government tendered no issue as to ownership of the improvements, but alleged: "That the Secretary of the Navy * * * has determined that it is necessary that the United States acquire the following interests in the hereinafter described lands and improvements thereon * * *." And further alleged that the warehouses "are owned in fee by the City of Los Angeles, and are subject to a sublease to defendant Goodyear Tire & Rubber Company * * *."

Over a year after filing the original complaint, by an amendment on December 9, 1952, the Government alleged that it sought by this action to condemn the land "Together with all improvements thereon which are not owned by the United States * * *. That such real property exclusive of improvements are owned in fee by the city of Los Angeles and are subject to a sublease to defendant * * * Goodyear * * *, but plaintiff makes no admissions as to the ownership of the improvements consisting of but not limited to [the] Warehouses * * * but demands strict proof of ownership by defendant in any demand for just compensation."

On March 3, 1953 the Government for the first time filed a Declaration of Taking, which declares that "The estate hereby taken in each parcel is a term for years in and to the lands, less and except any and all right, title and interest owned or held by the United States * * * in each parcel prior to the beginning of such term for years."

In order to protect its rights to compensation as sublessee, Goodyear continued making monthly rental payments to Outer Harbor until the Declaration of Taking was filed on March 3, 1953.

On these facts defendants contend: (1) that by the provisions of the subleases in effect at the time the improvements were made, title passed to Outer Harbor at the termination of the subleases; or (2) that the proposed supplemental agreements between the Navy and Outer Harbor were effective to pass to Outer Harbor title to the improvements; or (3) that a contract to make a contract was formed between the parties; or, in all events, (4) that the Government is now estopped to assert any title it may have because of the conduct of its officials on which both Outer Harbor and Goodyear reasonably relied to their detriment.

Since "there is no federal general common law", Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188, and no federal statute controls the matter, title to the improvements in controversy, which are fixtures, Cal.Civ.Code § 660, and thus part of the realty, Bell v. Bank of Perris, 1942, 52 Cal.App.2d 66, 125 P.2d 829, is governed by the law of the place where situated— California. Cal.Civ.Code § 755; O'Donnell v. United States, 9 Cir., 1937, 91 F.2d 14, reversed on other grounds, 1938, 303 U.S. 501, 58 S.Ct. 708, 82 L.Ed. 980.

The law of California is well settled that: "If [fixtures] * * * are not removed during the term of the tenancy or within a reasonable time thereafter, they remain part of the realty." Trabue Pittman Corp. v. Los Angeles County, 1946, 29 Cal.2d 385, 175 P.2d 512, 518; Wadman v. Burke, 1905, 147 Cal. 351, 81 P. 1012, 1 L.R.A.,N.S., 1192; see Smith v. United States, 10 Cir., 1940, 113 F.2d 191, 193.

Absent a specific stipulation to the contrary, where "the government reserved the privilege of removing * * * [the structures] at the end of the lease or within ninety days thereafter", ownership passes if the structures are not removed within the stipulated time. United States v. Hayman, 7 Cir., 1940, 115 F.2d 599, 601; see Cone v. Western Trust and Savings Bank, 1937, 21 Cal.App.2d 176, 68 P.2d 981.

But where as here the parties to a lease specifically agree that the improvements "shall be and remain the property of the Government * * *", thus evidencing a clear intent contrary to the law of fixtures, their expressed intention is controlling. See Anderson-Tully Co. v. United States, 5 Cir., 189 F.2d 192, 196, certiorari denied, 1951, 342 U.S. 826, 72 S.Ct. 47, 96 L.Ed. 624; Searl v. School District, 1890, 133 U.S. 553, 561, 10 S.Ct. 374, 33 L.Ed. 740. In such a case, the specific reservation of property in the Government cannot be ignored.

It is also noted that the parties to the subleases here were, of necessity, aware of the prime lease from the city of Los Angeles to Outer Harbor; and had they desired ownership of the improvements to pass to Outer Harbor *eo instante* on termination of the subleases, it would have been a simple matter for them expressly so to provide by employing language similar to that used in the prime lease, which provides: "* * * upon the expiration * * * of said * * * lease * * * all [improvements] * * * constructed * * * by [Outer Harbor] * * * shall be and become the property of the city of Los Angeles without compensation therefor * * *."

In these circumstances, failure of the parties here to employ in the subleases language expressly transferring ownership of the improvements to the sub-lessor, Outer Harbor, precludes any conclusion that the parties intended title

should automatically pass upon termination of the subleases.

It is worthy of mention, too, that pendency of the negotiations for a compromise of the restoration obligation—involving as they did the same structures—dispels any inference of intent on the part of the Navy to abandon and surrender the improvements at the time possession was surrendered on July 25, 1950. Wm. Wolff & Co. v. Canadian Pac. Ry. Co., 1899, 123 Cal. 535, 56 P. 453; St. John v. Kidd, 1864, 26 Cal. 263; see: Old Dominion Land Co. v. United States, 1925, 269 U.S. 55, 65, 46 S.Ct. 39, 70 L. Ed. 162; Baglin v. Cusenier Co., 1911, 221 U.S. 580, 597, 31 S.Ct. 669, 55 L.Ed. 863; Anderson-Tully Co. v. United States, supra, 189 F.2d at page 197.

■ Turning now to the issue of equitable estoppel, it should be recalled at the outset that the power of this court to apply the rules of equity in any case is derived from section 2 of article III of the Constitution, wherein it is declared that "the judicial Power of the United States shall extend to all Cases in Law and Equity, arising under this Constitution, the Laws of the United States * * *." U.S.Const. Art. III, Sec. 2.

Until the 1948 revision of the Judicial Code, the language of the conferring statute gave the District Courts "jurisdiction * * * of all suits of a civil nature, at common law or in equity, brought by the United States * * *." 28 U.S.C. § 41 (1), (1940 ed.); cf. 40 U.S.C. § 257.

Now, by § 1345 of the new title 28, it is provided that the District Courts "have original jurisdiction of all civil actions, suits, or proceedings commenced by the United States * * *." 28 U.S.C. § 1345; cf. id. § 1358. The words "civil actions, suits or proceedings" were substituted for "suits of a civil nature, at common law or in equity" in view of the provision of Rule 2 of the Federal Rules of Civil Procedure, that there "shall be one form of action to be known as 'civil action.'" Fed.Rules Civ.Proc. Rule 2 and note 2, 28 U.S.C.A.

■ Once granted general jurisdiction over a subject matter, the District Courts are empowered in proper cases to exercise their equity jurisdiction as well. That is to say, in the language of Briggs v. United Shoe Mach. Co., 1915, 239 U.S. 48, 36 S.Ct. 6, 60 L.Ed. 138, "the * * * powers of Federal courts when sitting as courts of equity * * * can be exerted only in cases otherwise within the jurisdiction of those courts as defined by Congress." 239 U.S. at page 50, 36 S.Ct. at page 7; see Twist v. Prairie Oil Co., 1927, 274 U.S. 684, 689–692, 47 S.Ct. 755, 71 L.Ed. 1297.

■ As to scope it is settled that: "The equity jurisdiction conferred on inferior courts of the United States by * * * the Judiciary Act of 1789, 1 Stat. 78, and continued [to date] * * * is that of the English court of chancery at the time of the separation of the two countries." Matthews v. Rodgers, 1932, 284 U.S. 521, 529, 52 S.Ct. 217, 221, 76 L.Ed. 447.

"From the beginning", as Mr. Chief Justice Stone declared for the Court in Gordon v. Washington, 1935, 295 U.S. 30, 55 S.Ct. 584, 79 L.Ed. 1282, "the phrase 'suits in equity' has been understood to refer to suits in which relief is sought according to the principles applied by the English Court of Chancery before 1789, as they have been developed in the federal courts". 295 U.S. at page 36, 55 S.Ct. at page 587; accord, Waterman v. Canal-Louisiana Bank, 1909, 215 U.S. 33, 43, 30 S.Ct. 10, 54 L.Ed. 80; In re Sawyer, 1888, 124 U.S. 200, 209, 8 S.Ct. 482, 31 L.Ed. 402; Payne v. Hook, 1868, 7 Wall. 425, 74 U.S. 425, 430, 19 L.Ed. 260; United States v. Howland, 1819, 4 Wheat. 108, 17 U.S. 108, 115, 4 L.Ed. 526.

■ Moreover, as the Court declared in Payne v. Hook, supra: "The equity jurisdiction conferred on the Federal Courts * * * is uniform throughout the different States of the Union." 7 Wall. at page 430, 74 U.S. at page 430. This for the reason explained by Mr. Justice Todd for the Court in Robinson v. Campbell, 1818, 3 Wheat. 212, 16 U.S.

212, 4 L.Ed. 372: "In some states in the Union, no court of chancery exists, to administer equitable relief. * * * A construction, therefore, that would adopt the state practice * * * would at once extinguish, in such state, the exercise of equitable jurisdiction. * * * The court, therefore, think, that to effectuate the purposes of the legislature, the remedies in the courts of the United States are to be * * * in equity, not according to the practice of state courts, but according to the principles of * * * equity, as distinguished and defined in that country from which we derive our knowledge of those principles." 3 Wheat. at pages 222–223, 16 U.S. at pages 222–223.

█ Equitable estoppel, as an age-old principle of equity, "applies to all cases where rights, once valid, are lost by delay, and the implied acquiescence, resulting from such delay." 2 Story's Equity Jurisprudence 776, § 1534 (12th Ed. 1897). "An equitable estoppel is raised in favor of one who, in the belief that he has good title, is allowed by a property owner to expend money on the property." 2 Id. at 777, § 1537.

█ So it is that misleading conduct may serve as a basis for invocation of the doctrine of equitable estoppel. As Pomeroy says: "When one of two innocent persons—that is, persons each guiltless of an intentional, moral wrong—must suffer a loss, it must be borne by that one of them who by his conduct—acts or omissions—has rendered the injury possible. * * * This most righteous principle is sufficient to explain all instances of such estoppel, and although fraud may be, and often is, an ingredient in the conduct of the party estopped, it is not an essential element, if the word is used in its true legal meaning." 3 Pomeroy's Equity Jurisprudence 187–188, § 803 (5th Ed. 1941); accord, Cal.Civ.Code, § 3543; Powers v. Pacific Diesel Engine Co., 1929, 206 Cal. 334, 274 P. 512, 73 A.L.R. 1398; Couture v. Ocean Park Bank, 1928, 205 Cal. 338, 270 P. 943, 61 A.L.R. 267.

Pomeroy continues: "Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, or contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy." 3 Id. at 189, § 804.

With these principles in mind, consideration is turned to the familiar dictum that "there can be no estoppel against the government or its agencies." See Spencer v. Railroad Retirement Board, 3 Cir., 1948, 166 F.2d 342, 343; Walker-Hill Co. v. United States, 7 Cir., 162 F.2d 259, 263, certiorari denied, 1947, 332 U.S. 771, 68 S.Ct. 85, 92 L.Ed. 356; N. L. R. B. v. T. W. Phillips Gas & Oil Co., 3 Cir., 1944, 141 F.2d 304, 305; United States v. Globe Indemnity Co., 2 Cir., 94 F.2d 576, 578, certiorari denied, 1938, 304 U.S. 575, 58 S.Ct. 1047, 82 L. Ed. 1538; Brown v. United States, D.C. S.D.Mo.1952, 102 F.Supp. 132, 133. Like all generalizations, this one too is apt to mislead if one fails to remember that: "General propositions do not decide concrete cases." Holmes, J., dissenting in Lochner v. State of New York, 1905, 198 U.S. 45, 76, 25 S.Ct. 539, 547, 49 L.Ed. 937.

█ Equitable estoppel stands for the basic precepts of common honesty, clear fairness and good conscience. Myers v. Hurley Motor Co., 1927, 273 U.S. 18, 24, 47 S.Ct. 277, 71 L.Ed. 515; Mahoning Inv. Co. v. United States, Ct.Cl. 1933, 3 F.Supp. 622, certiorari denied, 1934, 291 U.S. 675, 54 S.Ct. 526, 78 L.Ed. 1064; see: Hill v. National Bank, 1878, 97 U.S. 450, 452–453, 24 L.Ed. 1051; Henshaw v. Bissell, 1873, 18 Wall. 255, 256, 271, 85 U.S. 255, 256, 271, 21 L.Ed. 835; Branson v. Wirth, 1872, 17 Wall. 32, 42, 84 U.S. 32, 42, 21 L.Ed. 566; Insurance Co. v. Wilkinson, 1871, 13 Wall. 222, 233, 80 U.S. 222, 233, 210 L.Ed.

617; First Federal Trust Co. v. First Nat. Bank, 9 Cir., 1924, 297 F. 353, 356; Grand Central Public Market v. United States, D.C.S.D.Cal., 22 F.Supp. 119, 126–127, 129, appeal dismissed, 9 Cir., 1938, 98 F.2d 1023; California Packing Corp. v. Sun-Maid Raisin Growers of California, D.C.S.D.Cal.1934, 7 F.Supp. 497, 499, reversed on other grounds, 9 Cir., 81 F.2d 674, certiorari denied, 1936, 298 U.S. 668, 56 S.Ct. 833, 80 L.Ed. 1391.

"The vital principle," the Supreme Court has said, "is that he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted." Dickerson v. Colgrove, 1879, 100 U.S. 578, 580, 25 L.Ed. 618.

Because a man should not be permitted to gain an advantage through his own fraud, actual or constructive, Randon v. Toby, 1850, 11 How. 493, 519, 52 U.S. 493, 519, 13 L.Ed. 784, tacit encouragement by conduct has been held sufficient to raise an estoppel. Swain v. Seamens, 1869, 9 Wall. 254, 274, 76 U.S. 254, 274, 19 L.Ed. 554; accord, Robbins v. United States, 1937, 21 F.Supp. 403, 407, 86 Ct. Cl. 39.

However, as the Court pointed out in Utah Power & Light Co. v. United States, 1917, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791, "the United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit." 243 U.S. at page 409, 37 S.Ct. at page 391; Note, Reliance on Advice of Government Officials, 33 Cornell L.Q. 607, 609 (1948).

Many of the cases restate this rule. Like Utah Power & Light Co. v. United States, supra, they involve actions of government agents which run counter to the law. The fact that the Government is involved is really not a determining factor in such cases, for no person can be estopped into a position contrary to law.

Public policy demands that the mandate of the law should override any doctrine of estoppel; so no amount of misrepresentation can prevent a party, whether citizen or Government, from asserting as illegal that which the law declares to be such. Federal Crop Insurance Corp. v. Merrill, 1947, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10; United States v. Stewart, 1940, 311 U.S. 60, 70, 61 S.Ct. 102, 85 L.Ed. 40; Wilber National Bank of Oneonta v. United States, 1935, 294 U.S. 120, 55 S.Ct. 362, 79 L.Ed. 798; Utah Power & Light Co. v. United States, supra, 243 U.S. 389, 37 S.Ct. 387; Commissioner v. Union Pac. R. Co., 2 Cir., 1951, 188 F.2d 950; James v. United States, 4 Cir., 1950, 185 F.2d 115, 118–119, 22 A.L.R.2d 830.

Want of authority of the agent whose conduct is relied upon to bind the Government is another factor to be noted in cases which declare that the doctrine of estoppel cannot properly be invoked against the Government. Lack of authority is fatal to a claim of estoppel based upon the conduct of an agent. All who deal with any agent of the United States are charged with notice of his lawful authority. United States v. Stewart, supra, 311 U.S. at page 70, 61 S.Ct. 102; Wilber National Bank of Oneonta v. United States, supra, 294 U.S. at page 123, 55 S.Ct. 362; Wisconsin Central R. Co. v. United States, 1896, 164 U.S. 190, 210, 17 S.Ct. 45, 41 L.Ed. 399; Lee v. Munroe & Thornton, 1813, 7 Cranch, 366, 368–369, 11 U.S. 366, 368–369, 3 L.Ed. 373; United States v. Norton, 5 Cir., 1935, 77 F.2d 731.

It is impossible of course for an agent to have authority to bind the Government, or anyone for that matter, contrary to law. See Federal Crop Ins. Corp. v. Merrill, supra, 332 U.S. at page 384, 68 S.Ct. 1; United States v. City and County of San Francisco, 1940, 310 U.S. 16, 31–32, 60 S.Ct. 749, 84 L.Ed. 1050; see Standard Oil Co. of California v. United States, 9 Cir., 107 F.2d 402, 416, certiorari denied, 1940, 309 U.S. 654, 60 S.Ct. 469, 84 L.Ed. 1003.

■ On the other hand, acts or omissions of agents lawfully authorized to bind the United States or direct its course of conduct during a particular transaction may estop the Government. Lindsey v. Hawes, 1862, 2 Black 554, 560, 67 U.S. 554, 560, 17 L.Ed. 265; United States v. Standard Oil Co. of California, D.C.S.D. Cal.1937, 20 F.Supp. 427.

■ Ritter v. United States, 3 Cir., 1928, 28 F.2d 265, states the rule succinctly: "The acts or omissions of the officers of the government, if they be authorized to bind the United States in a particular transaction, will work estoppel against the government, if the officers have acted within the scope of their authority." 28 F.2d at page 267.

Accordingly the Government has been held estopped by the actions of an agent in the survey of land, Lindsey v. Hawes, supra, 2 Black 560, 67 U.S. 560, in the sale of surplus goods, United States v. Jones, 9 Cir., 1949, 176 F.2d 278, 281, in the payment of funds, Walker v. United States, C.C.M.D.Ala.1905, 139 F. 409, 412-414, in the waiver of a provision in a cost-plus-fixed-fee contract, Branch Banking & Trust Co. v. United States, 98 F.Supp. 757, 766-769, 120 Ct. Cl. 72, certiorari denied, 1951, 342 U.S. 893, 72 S.Ct. 200, 96 L.Ed. 669, and in the grant of lands, United States v. Big Bend Transit Co., D.C.E.D.Wash.1941, 42 F.Supp. 459, 474, where the acts in question were found to have been lawfully done within the bounds of the agent's authority. See J. Homer Fritch, Inc., v. United States, 9 Cir., 1916, 236 F. 133, 134, reversed on other grounds, 1919, 248 U.S. 458, 39 S.Ct. 158, 63 L.Ed. 359.

Almost three decades ago the Court in Davis v. Pringle, 1925, 268 U.S. 315, 45 S.Ct. 549, 69 L.Ed. 974, pointed out that "Public opinion as to the peculiar rights and preferences due to the sovereign has changed." 268 U.S. at page 318, 45 S.Ct. at page 550; see Pound, A Survey of Public Interests, 58 Harv.L.Rev. 909, 922-923 (1945); Farrer, A Prerogative Fallacy—"That the Crown is not Bound by Estoppel", 40 L.Q.Rev. 511 (1933).

And Mr. Justice Frankfurter, in noting the "chilly feeling against sovereign immunity", recently observed for the Court that "even the immunity enjoyed by the United States as territorial sovereign is a legal doctrine which has not been favored by the test of time. It has increasingly been found to be in conflict with the growing subjection of governmental action to the moral judgment." National City Bank of New York v. Republic of China, 1955, 348 U.S. 356, 359, 75 S.Ct. 423, 426.

Both reason and policy, and precedent as well, argue that prejudicial reliance—reasonable reliance in good faith upon past and present conduct rather than future expectations—warrants invoking the doctrine of equitable estoppel against the Government.

■ Of course the Government still "may not be sued without its consent * * *." Lynch v. United States, 1934, 292 U.S. 571, 581, 54 S.Ct. 840, 844, 78 L.Ed. 1434; but where consent has been granted the case should be decided "as between man and man on the same subject-matter." United States v. Arredondo, 1832, 6 Pet. 691, 712, 31 U.S. 691, 712, 8 L.Ed. 547.

■ To summarize, the Government is bound by the doctrine of estoppel where: (1) there has been a waiver of sovereign immunity to suit, cf. Hopkins v. Clemson Agricultural College, 1911, 221 U.S. 636, 646, 31 S.Ct. 654, 55 L.Ed. 890, (2) the agent whose conduct is relied upon to work an estoppel acted within the scope of his authority lawfully conferred, and (3) application of the doctrine does not bring a result that is either inequitable or contrary to law. Cf. Smale & Robinson, Inc., v. United States, D.C. S.D.Cal.1954, 123 F.Supp. 457, 466-467.

Briefly put, then, in cases where sovereign immunity to suit has been waived, the Government can be estopped by the conduct of its agents in the same circumstances as a private individual, partnership, or corporation.

This being a condemnation suit by the Government in which ownership of cer-

tain buildings must be adjudicated, defendants should be permitted to invoke the doctrine here. The law requires, it is true, that: "Men must turn square corners when they deal with the Government." Rock Island, A. & L. R. Co. v. United States, 1920, 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188. But as observed by Mr. Justice Jackson upon dissenting in Federal Crop Ins. Corp. v. Merrill, supra, "there is no reason why the square corners should constitute a one-way street." 332 U.S. at pages 387–388, 68 S.Ct. at page 5.

To apply the principles of equitable estoppel here, it is recalled that Admiral Jelley specifically authorized Captain Johnson, and through him subordinates Muench and Mead, to accept Outer Harbor's offer of settlement which called for transfer to Outer Harbor of title to the improvements. This grant of authority fully empowered and authorized these agents of the Government to make a binding settlement disposing of title to the improvements. The condition attached to the grant of authority was satisfied by the letter of the Harbor Department freeing the Government of obligation to the City of Los Angeles. Thus the case at bar does not present a situation of broad and vague authority conferred upon a Government representative, but one of narrow, specific and qualified authority concerning one individual matter, expressly conferred on a particular occasion for a particular purpose.

Here, Muench and Mead did no more than accept Outer Harbor's offer, which was clearly within the scope of their express, albeit limited, authority.

Under these circumstances, it is not difficult to perceive why the agents both of the Navy and of Outer Harbor considered Outer Harbor owner of the improvements from the time of the Muench-Mead-Tilley meeting on July 24, 1950. Outer Harbor reasonably and in good faith believed from the words, conduct, and letters of the Government agents that an agreement, placing ownership of the warehouses in Outer Harbor, had been reached. Indeed, all parties negotiating could and reasonably did believe that a written agreement was only a formality not essential to the validity and efficacy of the settlement insofar as it related to title to the improvements.

Outer Harbor's expenditure of substantial amounts of money on the basis of its belief that title to the improvements had passed amply establishes detrimental reliance on its negotiations with the Naval officials.

The Government's implied acquiescence through delay is shown by its failure to take any action to protect the property right which it now asserts in the improvements, though its agents concerned in the matter knew of Outer Harbor's actions in refurbishing the warehouses and in finding a tenant for them. Instead of objecting to the exercise of such prerogatives of ownership, the same agents of the Navy in fact negotiated with Outer Harbor, as well as Goodyear, for new leases of the warehouses when the Naval Supply Depot was later reactivated. Naturally, such negotiations would be futile if Outer Harbor did not own the warehouses, and hence served to affirm Outer Harbor's belief that it was in truth the owner.

Here, as in United States v. Pennsylvania & Lake Erie Dock Co., 6 Cir., 1921, 272 F. 839, 848–849, the Government failed to take any action to assert its rights at the time, when Outer Harbor changed its position in reliance upon the absence of apparent ownership in the Government, brought about by the conduct of authorized Naval officials.

It was to the advantage of the Government to negotiate a cash settlement with Outer Harbor in return for a release of the obligation to remove the warehouses from the land, since the payment demanded by Outer Harbor amounted to much less than the Government estimate of the cost of removal. It was advantageous to Outer Harbor as well to acquire, in addition to a cash payment of $155,000, the improvements which, with an expenditure of approximately $60,000, could be rented for some $7,600 per month. Both parties thus stood to benefit by settlement

of the removal obligation. The economic waste in dismantling and removing the warehouses was apparent to both sides.

The Government received the entire consideration for which it originally bargained—a lease of the land subject to the requirement of removing its buildings when the premises were vacated. The Government also received the consideration for which it bargained subsequently —release of the obligation to remove the buildings in exchange for surrender of ownership plus a cash payment.

In such an arrangement there is no inequity to bar application of the doctrine of equitable estoppel. See Goltra v. United States, 96 F.Supp. 618, 119 Ct.Cl. 217, modified and affirmed, 1941, 312 U.S. 203, 61 S.Ct. 487, 85 L.Ed. 776. The later need of the Navy for the property was a contingency which neither party could reasonably be required to foresee.

Though the original subleases were not as clear as they might have been on the question of the ownership of the warehouses after the termination of the subleases, the surrender of possession to Outer Harbor and the negotiations by Naval officials, specifically authorized to settle the matter of restoration, make it abundantly clear that the Government should be held estopped to assert whatever title it could otherwise claim to the improvements.

The Government allowed Goodyear to lease and to take possession of the premises without knowledge that the Government would later claim ownership of the buildings. Moving its goods into the warehouses was a substantial expense. Goodyear was also misled by the Navy's later request for a sublease of the premises from Goodyear. See Jones v. United States, 9 Cir., 1952, 195 F.2d 707. Had the Government claimed ownership of the buildings at that time, it hardly would have attempted to negotiate a sublease from a mere occupier of the premises.

Under the circumstances at bar, where substantial changes of position based on reasonable and good faith belief have been made, the Government, like any other party, is estopped to deny the title of Outer Harbor to the improvements and the validity of the sublease from Outer Harbor to Goodyear.

This holding as to the issue of equitable estoppel makes it unnecessary to draw conclusions as to the other issues of law raised by defendants.

For the reasons stated, findings of fact, conclusions of law and judgment in favor of defendants and against plaintiff on the issue of the ownership of the improvements may be lodged with the Clerk pursuant to local rule 7 within ten days.